**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-6**

QUINCY J. ALLEN,

Petitioner - Appellant,

v.

MICHAEL STEPHAN, Warden, Broad River Correctional Institution,

Respondent - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Donald C. Coggins, Jr., District Judge.  (0:18-cv-01544-DCC-PJG)

Argued:  September 22, 2021                    Decided:  July 26, 2022

Before GREGORY, Chief Judge, HARRIS, and RUSHING, Circuit Judges.

Reversed and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Harris joined.  Judge Rushing wrote a dissent.

**ARGUED:**  Aren Kevork Adjoian, FEDERAL COMMUNITY DEFENDER OFFICE, Philadelphia, Pennsylvania, for Appellant.  Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.  **ON BRIEF:**  Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South Carolina; E. Charles Grose, Jr., GROSE LAW FIRM, Greenwood, South Carolina, for Appellant.  Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.

GREGORY, Chief Judge:

Quincy Allen was convicted of two capital murders and sentenced to death in a South Carolina state court. During the penalty phase, the government and defense experts agreed that Allen suffered persistent childhood abuse; they also agreed that he had at least one mental illness—rumination disorder—and disagreed as to another—schizophrenia. Yet, the sentencing judge concluded that "Allen was [not] conclusively diagnosed as mentally ill" and found no "conclusive proof of mitigating circumstances." Allen exhausted his state court direct appeal and post-conviction remedies in seeking to overturn his death sentence. He then filed the instant federal petition pursuant to 28 U.S.C. § 2254, raising several claims. The district court dismissed his petition, and Allen appealed.

We granted a certificate of appealability on five issues, including whether the sentencing judge committed constitutional error by "[(i)] fail[ing] to find that any mitigating circumstance had been established and [(ii)] us[ing] an impermissibly high standard for determining whether [] Allen suffered from mental illness."

As explained below, we conclude that the state court's conclusion that the sentencing judge "considered Allen's mitigation evidence as presented" was an unreasonable determination of the facts and its conclusion that the sentencing judge gave "proper" consideration was contrary to clearly established federal law. Because we have grave doubt that the state court's errors did not have a substantial and injurious effect, we reverse and remand.

2

I.

A.

Quincy Allen's childhood was marked by severe abuse and neglect. He also has a lengthy history of mental health issues, including major mental illness diagnoses and a history of commitments. Because both forms of mitigating evidence are important to resolution of his claims, we go into some detail about them here.

Allen is the product of a short-term relationship between a 19-year-old soon-to-be deployed military man who "never really thought about [the] family thing" and a woman who confesses "never bonded" with any of her five children. S.J.A. 1804, 1807, 1809, 1819. "[P]atterns of intergenerational abuse and neglect go back at least to [Allen's] maternal great-grandfather's large and chaotic family and bear strong similarities to the abuse and neglect" that branded Allen's childhood. S.J.A. 1804.[1]

Allen's early hospital emergency room and pediatric notes show an ingestion of a bottle of perfume (twelve months of age) and a burn on his foot that his mother said came from a babysitter (fifteen months of age). S.J.A. 1807. At nineteen months, Allen was hospitalized for a week after an untreated fever progressed to pneumonia. Noting signs of medical neglect, emergency room personnel referred Allen's case to Protective Services. S.J.A. 1807–08.

---

[1] The quoted testimony in this subsection is based on the report of social worker Deborah Grey and is undisputed unless otherwise noted. This report is part of the state court record and is located on the district court docket (18-cv-01544) under ECF No. 65-24.

Allen witnessed and suffered physical abuse throughout his childhood as well. His earliest memories are of when his mother was married to his stepfather. S.J.A. 1808. He remembers his stepfather beating him and his mother. *Id.* On one occasion, Allen's stepfather entered his room, picked up a gun from the floor and returned to another room where he pistol-whipped Allen's mother. *Id.*; J.A. 1262. During another incident, while in the backyard, Allen's stepfather held Allen up, placed a gun to his face, aligned the gun site with Allen's eye, and pulled the trigger—his stepfather needed "target practice." J.A. 294; S.J.A. 1808. When Allen was three, his stepfather hit him so hard that he fractured Allen's tibia. S.J.A. 1808. About one year later, his mother got a restraining order against Allen's stepfather; his stepfather found them, attacked his mother with a knife and hammer, and repeatedly broke into their home and stole things. S.J.A. 1809. Allen hid under the bed with a telephone so he could call 911 if his stepfather showed up. *Id.* By this point, Allen's mother had four children and all of them were "accidents," according to Allen's stepfather. S.J.A. 1810. He said Allen's mother would have sold Allen if she could have made money off him. *Id.*

Allen's grade school career would include fifteen school changes before it ended. S.J.A. 1811. When Allen was elementary school-age and did something wrong, his mother forced him into a dark closet. *Id.* She also punished him by pushing him down, then kicking or stomping on him, or forcing him to sleep in the bathroom with no clothes, pillow, or blanket. S.J.A. 1815–16. She also stripped him naked, used an extension cord to tie him up to the end of the bunk beds "kind of like Jesus," and beat him with a belt, switch, or her hands. S.J.A. 1811, 1815. When she got tired, she walked off to rest awhile and

4

eventually came back to beat him some more. S.J.A. 1811. Allen's aunt said that he "stayed . . . [getting] beat half to death," sometimes for insignificant transgressions. S.J.A. 1816. On one occasion, she threw him into a large trashcan—"the kind with wheels and a swing shut lid" that "trash men pick up with a machine and dump over," Allen described. S.J.A. 1811. She shut the lid on him. *Id.* At some point during his childhood, after seeing a television show during which a guy survived being in ice cold water in Alaska by convincing himself that the water was warm, Allen decided that pain is all in the mind. S.J.A. 1811–12. As an adult, he told some friends this and they beat him with a wire hanger: "[He] didn't feel it." S.J.A. 1812.

During this time, Allen's mother began denying Allen and his siblings food. *Id.* She stacked and stored the food by type, so she immediately knew if something went missing; she marked all containers, so she could tell if food was removed; and she punished Allen by withholding food for several days in a row. S.J.A. 1812, 1815–16. According to his aunt, Allen always looked "scrawny and half starved." S.J.A. 1812. He stole Kool-aid, cookies, and Little Debbie's snacks from nearby stores, and hoarded food. *Id.* During family gatherings, he ate so much that he threw up. *Id.* And a neighbor once observed Allen and his siblings drinking rainwater as it came down the gutter. J.A. 299. Around the second grade, Allen began ruminating. S.J.A. 1812. About half an hour after eating, he would push his food back up by contracting his stomach muscles, fill his mouth until his cheeks puffed out, re-chew the food, swallow it, and then bring it up again and again. S.J.A. 1812–13. He smelled of vomit all the time. J.A. 308. Allen states he continues to

5

do this daily; it's a compulsion. S.J.A. 1813. "Now its just like getting up in the morning," he said. *Id.*

Allen also experienced a highly unstable home environment, marked by his mother locking and kicking him out of the house as early as second grade and attempting to give up custody of him. When Allen was in the second grade, his mother warned him to come straight home from school. *Id.* One day, he went to a friend's house instead. *Id.* When he got home, his mother put him in the car, drove him to Social Services, and placed him in foster care. *Id.* His first set of foster parents hit their own kids with pots and pans. *Id.* Eventually, his mother signed over custody to a family friend, with whom Allen lived for about half a year. *Id.* At the beginning of third grade, Allen returned home and, when he was in fourth grade, Allen's mother began kicking him out of the house. *Id.* She would open the door, tell him to get out, and he slept outside in whatever he happened to have on. *Id.* Allen ran away from home with his sister in the fifth grade. *Id.* They left immediately after school and kept running until night hit. *Id.* A sheriff took them home. *Id.* Allen's mother was not happy to see him back: She said, "[i]f you run away again, leave your sister here." *Id.* And she yelled a lot, saying things like, "I hate you. When you're 18, you're getting out of this house." S.J.A. 1815.

In the sixth grade, Allen's mother locked him out overnight on the first of what would become countless occasions. S.J.A. 1816. He would sleep on the porch, where he feared the neighborhood dogs might attack him. *Id.* By this time, Allen's mother had also thrown a chair at him, shoved him against a stove, tried to hit him with a hammer, and choked him with a tie until he fainted. S.J.A. 1818. His mother, his siblings, and the

6

neighborhood kids beat, teased, and picked on Allen, calling him "Alien," "Waterhead," "Mr. Spock," and "Elephant Ears." S.J.A. 1814-15, 1822. In the seventh grade, he got caught with a knife on school property. S.J.A. 1817. On a different occasion, he brought a large glass bottle to school intending to go after one of his bullies. *Id.* He was eventually suspended, taken to court, and sent to a juvenile correctional center for over a month. *Id.* He then lived in a group home for two weeks; with his uncle in Rock Hill, South Carolina for half a year; with his father in Georgia for over three months; and eventually made his way back to his mother's home. S.J.A. 1819.

Allen lived with his mother for half of ninth grade. S.J.A. 1820. But the instability and chaos persisted. She continued to withhold food and beat him as he stood naked, holding onto the back of the kitchen chair. *Id.* He moved up to Colorado to live with his father for the following year. *Id.* Halfway through the tenth grade, he again returned to his mother's home. S.J.A. 1821. During this time, Allen's mother continued her tradition of requiring her kids to come home immediately after school and wait in the driveway or walk around the house until she eventually arrived home (even in the winter). *Id.* She also installed motion detectors to ensure the kids remained in the basement, never went upstairs, and did not go outside without her permission. S.J.A. 1821, 1823. Eventually, Allen went to live with his uncle again but does not remember why because, by that point, his mother had thrown him out of the house many times for many reasons. S.J.A. 1821. But just under one year later, he returned to his mother's home, where she continued the pattern of repeatedly kicking him out, rendering Allen homeless. *Id.* During periods of homelessness, Allen slept in bushes, a friend's treehouse, or on the McDonald's

7

playground after closing each day—all while trying to keep up with school assignments. J.A. 269–70; S.J.A. 1829. His clothes remained filthy, and teachers found his body odor unbearably overwhelming. S.J.A. 1830. One of Allen's friends said that, eventually, "the light seemed to go out" in him. S.J.A. 1831. He would not look at you, showed no emotion on his face or in his voice, began to mumble to himself, and started setting fires for no reason, including using gasoline to burn a smiley face onto someone's lawn. S.J.A. 1831–32.

While enduring this abuse, Allen began having mental health problems. By 2002, he had been hospitalized seven times and had received various diagnoses. The mental health challenges began at a young age. As mentioned earlier, he regularly engaged in the practice of ruminating, beginning in second grade. In sixth grade, he saw a mental health professional fourteen times during the academic year and was diagnosed with oppositional defiant disorder. S.J.A. 1817. During his senior year, Allen's mother finally took him to a dentist to address his severely eroded, chipped, and discolored teeth. S.J.A. 1825. The dentist referred Allen to an internist, who formally diagnosed Allen with rumination syndrome, which the internist described as "[a] diagnosis [] rarely made in adolescence and adults and [] not easy to treat." *Id.* "[I]t was going to take extraordinary effort on [Allen's] part to overcome this longstanding problem," the internist explained at the time, and treatment would include "counseling[] [and] possible psychopharmacologic intervention." *Id.*

The internist referred Allen to a child psychiatrist, Dr. Richard Harding. *Id.* During his first appointment with Dr. Harding, Allen admitted to ruminating multiple times a day

8

for about the last 10 years. *Id.* Dr. Harding noted that "this obsessive behavior is more difficult to treat the longer it has existed and the more frequent it occurs." S.J.A. 1826. "I am less than optimistic about the prognosis in this case," he wrote back then. *Id.* But still, he started Allen on Prozac, which could "decrease the compulsivity." *Id.* Allen and his mother returned about one month later, at which time she asked when Allen could stop taking the antidepressants and "do it on his own." *Id.* Dr. Harding "tried to explain that this was a long-term process and will take an extended period of time to be helpful, and [] may not be [helpful at all]." *Id.* "Mother is very demanding and difficult," he noted. *Id.* About three weeks later, Allen reported to Dr. Harding that he was doing well but, soon after, Allen heard a voice for the first time. *Id.* The voice said: "I want you to kill a lot of people at your school tomorrow." *Id.* It "freaked me out," Allen explained, "but I also thought it was ridiculous because I didn't even have a gun." *Id.*

Between the ages of 17 and 20, Allen cycled in and out of psychiatric hospitals seven times. Nine days after Allen's last visit with Dr. Harding, Allen's mother threw him out of the house. S.J.A. 1827. He returned, busted windows and threw furniture, and made his way to the attic where the police observed him eating insulation.[2] J.A. 339; S.J.A. 1827. He was referred to an inpatient psychiatric facility, marking his first commitment. J.A. 339–41. At the end of his two-day stay, he was discharged with diagnoses of depressive reaction, atypical eating disorder, and identity disorder of adolescence, and given a prescription for Prozac. S.J.A. 1827.

---

[2] Allen stated he got some insulation in his mouth as the police tried to pull him out of the attic. J.A. 534.

9

His second commitment came about one week later, after his mother kicked him out again. J.A. 343. He went to a Wal-Mart, stole Tylenol, and ingested it. *Id.* When he arrived at the emergency room, hospital staff administered charcoal and contacted his mother, who refused to come and refused to take him home. J.A. 268. Though he was initially involuntarily committed, he voluntarily committed himself on his 18th birthday. J.A. 267–68. His progress notes described Allen as having "no coping skills," a "flat affect," and "zero insight." S.J.A. 1828–29. He was discharged two weeks later with diagnoses of atypical eating disorder, major depression-nonpsychotic, and identity disorder of adolescence. J.A. 269; S.J.A. 1829.

When Allen was 18 and a half, he climbed up onto a maintenance platform of a road sign over the interstate. J.A. 349–50. He threatened to commit suicide by jumping off the overpass. J.A. 2169. Emergency personnel reached him using a cherry picker; once inside the cherry picker basket, Allen refused to exit because he was "comfortable in it." J.A. 349–50. He rode to the emergency room in the basket and was committed for the third time. J.A. 350. Upon discharge eight days later, his final diagnosis was adjustment disorder with depressed mood. S.J.A. 1834.

Allen's fourth commitment occurred one month later, when he brought himself to the hospital expressing suicidal ideation. J.A. 359–60; S.J.A. 1834. During this stay, he threatened staff members and received the antipsychotic Haldol and the antianxiety medication Ativan. J.A. 361–62. When a social worker contacted Allen's mother, she demanded the social worker not contact her again and made clear that Allen could not come live with her. J.A. 362. After about three weeks of hospitalization, he was diagnosed with

10

adjustment disorder with depressed mood, history of marijuana abuse, personality disorder not otherwise specified, and was discharged to live at the Salvation Army. J.A. 2169; S.J.A. 1835.

Two months later, Allen was hospitalized a fifth time, at which time he was again homeless and living out of his car. J.A. 363, 2169; S.J.A. 1834. After wrapping up his third day on the job at Kroger, Allen was waiting in the video section of the store for a ride. J.A. 363; S.J.A. 1836. The store manager, thinking Allen was a vagrant, told him to leave. J.A. 363. Upon learning that Allen worked there, the manager fired him. J.A. 363–64. Later that night, Allen was found atop the store threatening to jump. J.A. 364. The police called his mother and, when she arrived a couple of hours later, she laughed and walked away. S.J.A. 1836. Allen was, again, committed. J.A. 364. During this visit, Allen declared that he wanted to kill his mother and be the next mass murderer. J.A. 374–75, 378. He was diagnosed with adjustment disorder with depressed mood and personality disorder not otherwise specified. J.A. 2169.

About one month before his 19th birthday, Allen was discharged to a different facility for further treatment at his request, marking his sixth commitment. *Id.* At the new facility, staff noted his visual hallucinations, as well as suicidal and homicidal thoughts. J.A. 381, 384, 391. Four days after he informed staff that he wanted to buy a gun and kill his family, the hospital decided he had achieved "maximum benefit" and discharged him. S.J.A. 1838. He was diagnosed with depression and placed on Prozac. J.A. 2169. Upon discharge, Allen was again homeless. J.A. 399.

11

Within a matter of days, he attempted to steal a car from someone's garage and was arrested, convicted, and incarcerated. J.A. 399–403. During this period, he was hospitalized for the seventh time and reported thoughts of going on a murder spree and hurting everyone who had ever harmed him. J.A. 402–03. These homicidal thoughts coincided with more serious suicide attempts. *Id.* He initially attempted to ingest soap while he was awaiting trial in the Richland County Detention Center. J.A. 401. After he was moved to the Department of Corrections, he tried to swallow hoarded bleach, then attempted to overdose on hoarded antidepressants. J.A. 406–07. He was diagnosed with major depressive disorder and placed on antidepressants. S.J.A. 1839. Allen remained incarcerated from October 27, 1998 to August 31, 2000, which was about two months before his 21st birthday. J.A. 2170.

After his release, Allen returned to live with his mother and worked a variety of jobs. *Id.* He did relatively well for a period of time, until his mother once again threw him out of her house. J.A. 407–09. Allen then quit his job and became "intensely suicidal." J.A. 409. He again attempted suicide by swallowing ammonia capsules and Excedrin pills, J.A. 411, and later swallowed a box of rat poison, *id.* By 2002, he reported feeling immortal because of his repeated lack of success in killing himself. J.A. 2170.

B.

At approximately 3:00 a.m. on July 7, 2002, when Allen was 22 years old, he approached James White, a 51-year-old man lying on a swinging bench in a park located in Columbia, South Carolina. Allen ordered White to stand and shot him in the shoulder. After White fell back onto the bench, Allen ordered him to stand back up and shot him

12

again. White survived and Allen would later tell the police that he used White as target practice because he did not know how to shoot his new gun.

Three days later, on July 10, Allen picked up Dale Hall on Two Notch Road in Columbia during a break from his job at Texas Roadhouse Grill. He drove her to an isolated cul-de-sac and shot her with a 12-gauge shotgun in the left thigh, shattering her leg. Hall pleaded for her life; she had kids and they would be motherless. Allen shot her in the torso. He then dragged Hall down a bank to a wooded area, placed the gun in Hall's mouth, and fired his third and final shot. Allen left to purchase a can of gasoline, returned to douse Hall's body, and set her on fire. He then made his way back to work to continue serving the dinner crowd. Later, after police descended on the crime scene, he found a dog and pretended to walk it atop a bridge that had a good view of the investigatory action.

One month later, on August 8, while working at the restaurant, Allen got into an argument with two sisters, Taneal and Tiffany Todd. He threatened to slap Tiffany, who was 12-weeks pregnant, so hard that her baby would have a mark on it. Tiffany's boyfriend, Brian Marquis, pulled up to the restaurant, accompanied by his friend Jedediah Harr, who drove the pair. A confrontation erupted outside, and Allen fired his shotgun into Harr's car, attempting to shoot Marquis; Allen missed Marquis, and the bullet struck Harr in the head. As the car rolled downhill, Marquis jumped out and ran into a nearby convenience store, where an employee hid him in a cooler. Allen entered the store looking for Marquis and eventually left; he made his way to Marquis' home and set the front porch ablaze. A few hours later, Allen set fire to the car of Sarah Barnes, another Texas Roadhouse employee. And shortly thereafter, Harr died of the shotgun blast to the head.

13

The following day, on August 9, Allen set fire to the car of another man, Don Bundrick, whom he did not know. Later that evening, Allen went to a strip club in Columbia, where he pointed his shotgun at a patron. Allen then left South Carolina and drove all the way up to New York City. On his way back, while in North Carolina, Allen shot and killed two men at a convenience store in Surrey County. Allen then made his way to Texas, where police apprehended him on August 14.

Allen confessed to committing the crimes. He began killing people because, while he was incarcerated, an inmate told Allen that he could get Allen a job as a mafia hit man. But Allen got tired of waiting for his first assignment and decided to embark on his own killing spree. He would have killed more people if he could have gotten his hands on a gun sooner, Allen explained. But, of course, his prior record made that difficult.

C.

Allen first faced prosecution in North Carolina, where he pleaded guilty to two counts of first-degree murder, two counts of armed robbery, and one count of larceny of an automobile. *See* J.A. 113–15. In exchange, Allen received a sentence of life without the possibility of parole for the murders and terms of years on the remaining charges. *See id.* Although the North Carolina sentence had been agreed upon, both the government and defense called multiple witnesses at Allen's three-day sentencing hearing. *See id.* The North Carolina trial court found that "the evidence is convincing that [] Allen is mentally

14

ill" and recommended he receive a psychiatric evaluation, counseling, and treatment upon entering the Department of Corrections. J.A. 115, 117.[3]

The South Carolina proceedings began thereafter. In September 2002, a Richland County grand jury indicted Allen for two counts of murder, assault and battery with intent to kill, second degree arson, two counts of third-degree arson, and pointing and presenting a firearm. J.A. 2535–36. The Honorable G. Thomas Cooper, Circuit Court Judge, presided over the case and appointed E. Fielding Pringle, April Sampson, Robert Lominack, and Kim Stevens to represent Allen. *See* J.A. 120. Two years passed and, on April 5, 2004, the government filed a Notice of Intent to Seek the Death Penalty. J.A. 1658–59.

Trial was set for Monday, February 28, 2005. About one week prior, on Tuesday, February 22, Lominack asked Solicitor Barney Giese to meet with Dr. Pam Crawford, one of the defense's mental health experts. J.A. 2241, 2243. Pringle had directed Dr. Crawford to meet with and convince the government that Allen was mentally ill and, thus, that the government should consider a plea agreement. J.A. 2243. The next day, on Wednesday, February 23, after refusing initially, Giese agreed to meet with Dr. Crawford. J.A. 2242.

---

[3] The full list of mitigating factors found by the North Carolina trial court is as follows: (i) "[t]he defendant was suffering from a mental or physical condition that was insufficient to constitute a defense, but significantly reduced the defendant's culpability for the offense"; (ii) "[t]he defendant's age and maturity or limited mental capacity at the time of the commission of the offense significantly reduced the defendant's culpability for the offense"; (iii) "[p]rior to arrest or at an earlier stage of the criminal process the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer"; (iv) "[t]he defendant has accepted responsibility for the defendant's criminal conduct"; (v) "[t]he felony was committed while the defendant was under the influence of mental or emotional disturbance"; and (vi) "[t]he capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was impaired." J.A. 102–03.

That same day, Dr. Crawford met with the government without trial counsel present. *Id.* The parties agree that the government declined to strike a deal but encouraged the defense to meet with the trial judge *ex parte* to discuss a life sentence. J.A. 2244; *see also* J.A. 43, 2486, 2498–99.

The next day, on Thursday, February 24, Pringle, Lominack, and Sampson attended an *ex parte* meeting with the trial judge. J.A. 2245, 2321. Pringle explicitly and repeatedly asked the trial judge if he would return a life sentence if Allen pleaded guilty. J.A. 2246–48. Though the trial judge made no explicit commitments, J.A. 45, 2418, he did (prior to the *ex parte* meeting) gift Pringle a book called *Ultimate Punishment*, which—as the trial judge later explained—discusses why the death penalty is reserved for the "worst of the worst." J.A. 2009–10, 2013. In addition, during the *ex parte* meeting, the trial judge said that no judge likes to see the bold, black word "reversed" under his name and one way to keep that from happening would be to give Allen life. J.A. 2009–10, 2249. The trial judge also mentioned that he called Giese, who stated that he would not be upset if the trial judge sentenced Allen to life. J.A. 2009–10, 2247–48. The trial judge explained that Giese's position mattered to him and maintained that he would not be bothered if the public disliked a decision to hand down a life sentence. J.A. 2009–10, 2249. Pringle told the trial judge that she "did not want to be sitting on a witness stand in a capital PCR hearing one day explaining why [she] pled [Allen] in front of a judge who would give him death." J.A. 1957. According to Pringle, the trial judge said: "[T]here will never be a capital PCR hearing[,] so you don't have to worry about that." *Id.*

16

In an affidavit drafted in October 2005—seven months after the conclusion of the sentencing ("Post-Sentencing Affidavit")—the trial judge did not deny telling defense counsel "there will never be a capital PCR hearing[,] so you don't have to worry about that." *Id.* Rather, he stated that he has "no recollection of any discussion of [the] PCR hearing that [] Pringle reference[d]." J.A. 2010. He also did not disclaim trial counsel's assertion that he gave them "hints." *Id.* The trial judge admitted he was "sympathetic" and inclined to give Allen a life sentence based on what trial counsel told him about Allen's "severe mental illness." *Id.* But, the trial judge explained in the Post-Sentencing Affidavit:

> "I did say . . . that, if they pled [] Allen guilty, I thought the [d]efense team would have to trust Dr. Crawford to convince me that [] Allen was so mentally ill throughout the time of his crimes and was so mentally ill at the time of trial, that imposition of the death penalty would violate the Eighth Amendment's ban on cruel and unusual punishment."

*Id.* "I did not use these words," the trial judge declared, "but assumed they knew what I meant by saying 'you'll have to trust Dr. Crawford.'" *Id.*

On Friday, February 25, the day after the *ex parte* meeting, trial counsel called the trial judge to inform him that Allen would plead guilty. J.A. 2033. The weekend passed and, on Monday, February 28, Allen pleaded guilty to all seven charges and waived his right to a jury trial. J.A. 123, 2475–76.

17

D.

The penalty phase of the trial began one week later, on March 7, 2005. The government presented evidence of aggravating factors supporting a death sentence.[4] J.A. 175–77.

Defense counsel then opened its presentation of mitigators, explaining that the evidence would show the "chain of isolation, neglect[,] and abuse" Allen endured, as well as his schizophrenia and "rare" "psychiatric disorder called rumination." Dist. Ct. Dkt., ECF No. 19-1 at Pg ID 87–88.[5]

A team of five specialists presented Allen's mitigating evidence. The team included social worker Deborah Grey, general and forensic psychiatrist Dr. Crawford, forensic and correctional psychiatrist Dr. Donna Schwartz-Watts, general and forensic psychiatrist Dr. George Corvin, and child psychiatrist Dr. Harding.

Grey testified at length about Allen's childhood abuse, psychiatric admissions, suicide attempts, and mental status leading up to the murders. J.A. 251–433.

Dr. Crawford interviewed Allen six times—twice in May 2004, once in July 2004, once in February 2005, and twice in March 2005—and ultimately diagnosed him with

---

[4] The South Carolina Code requires the finding of at least one statutory aggravating circumstance beyond a reasonable doubt during the penalty phase before a death sentence can be imposed. S.C. Code Ann. § 16-3-20(B), (C). The record is clear that the trial judge found at least that. J.A. 214 ("[finding] specifically that the State has made a sufficient showing of [the first] aggravating circumstance [as to Dale Hall] beyond a reasonable doubt").

[5] "Dist. Ct. Dkt." cites refer to documents included in the state court record and located on the district court docket (18-cv-01544).

schizophrenia and rumination disorder.[6, 7] J.A. 757–60. Rumination, Dr. Crawford

explained, is a "significant" and "truly bizarre disorder." J.A. 816, 958. "What it shows

is that he had significant pathology from the second grade on. . . . Very atypical. . . . [I]t

highlights that there's something very unusual about this person and . . . it would [] affect

his social relationships and make his life a lot more difficult. It's very unusual." J.A. 816.

Dr. Crawford explained that Allen continued to suffer from rumination disorder even after

_____

[6] It also appears that Dr. Crawford diagnosed Allen with depression. J.A. 758 ("He clearly had episodes of depression. He is diagnosed with depression."). But the parties do not discuss this apparent diagnosis, so we need not either.

In addition, Dr. Crawford did not disagree that Allen has anti-social personality disorder. J.A. 834–35. But she further explained: "The way DSM-IV talks about it is that you can't diagnose anti-social personality disorder when the symptoms are appearing in the context of psychotic illness. . . . [I]t's reductionistic as to what's going on with him. . . . [H]e did a lot of things that would be consistent with traits of people with anti-social personality disorder. The problem again is in the presence of the mental illness that he had[,] it's difficult to distinguish what is from the primary mental illness and what is from the personality problem . . . ." J.A. 834–35, 932.

[7] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") "devise[s] a set of meaningful criteria for diagnoses that allow psychiatrists and other mental health practitioners to . . . communicate with each other about patients[] and . . . develop a rational strategy for treating these illnesses." J.A. 608–09 (Dr. Corvin Transcript). Dr. Crawford describes Axis I disorders as mental illnesses and Axis II disorders as personality disorders. *See* J.A. 833–34, 959–60 (describing Axis I disorders as "major mental illness[es]"). All other experts who testified on the matter said the same. *See* J.A. 1050 (defense expert Dr. Schwartz-Watts agreeing that Axis I disorders are "major mental illness[es]"); J.A. 1274–75 (government expert Dr. Karla deBeck describing Axis I disorders as "major mental," "mood," or "psychotic disorder[s]" and Axis II disorders as personality disorders); J.A. 1442 (government expert Dr. Camilla Tezza discussing "Axis [I] mental illness"); J.A. 1480 (government expert Dr. Majonna Mirza describing "an Axis I disorder" as "a mental illness"). Schizophrenia (psychotic disorder category), rumination (eating disorder category), and depression (mood disorder category) are on Axis I. *See* J.A. 1275, 1447–48. Anti-social personality disorder is on Axis II. *Id.*

he committed the attendant crimes. J.A. 760. "[T]his is essentially a long lasting problem that's not going to go away with medication." *Id*.

Dr. Crawford also testified that she did not believe Allen was malingering (feigning his mental illness):

> [M]alingering or feigning symptoms does not mean you also do not have a mental illness. . . . We have numerous times mentally ill people who sometimes minimize symptoms, which I think he did at one point, and sometimes exaggerate symptoms. . . . But it means you've got to look through all that stuff to determine what is in the mental illness and what is the exaggeration of it. So that's something that's been very important . . . and difficult in this case.

J.A. 793.

She testified that when Allen was given the Structured Interview of Reported Symptoms test—a test to assess whether a patient is malingering—in North Carolina, the results indicated he was exaggerating but not malingering. J.A. 838. When he was given the same test three weeks prior to his South Carolina trial, the results showed no evidence of malingering. *Id.*

Dr. Schwartz-Watts met with Allen twice in March 2004, once in January 2005, and three times in February 2005. J.A. 1021–22. She opined that Allen suffered from schizophrenia and, at one point during her evaluation, was on "the highest dose of [the antipsychotic] Prolixin Decanoate [she had] ever seen in anybody," as well as "the maximum dose of [the antipsychotic] Geodon." J.A. 1021–22, 1032, 1047. She also diagnosed him with rumination, revealing the following during direct examination:

> Q: Dr. Schwartz-Watts, have you had occasion to observe Mr. Allen ruminating?

20

A: Yes.

Q: Do you recall when that is?

A: Yes. . . . I noted on February 28th, that was the day that Mr. Allen pled guilty, I observed him in the courtroom.

Q: What did you observe that indicated to you that he was still ruminating?

A: What I saw at the [angle] I was sitting, you could actually see what's called reverse [peristalsis]. You could see the muscles in his neck moving upwards, pushing through upwards. And I watched him. He was drinking water or something with ice, and I would watch it come up, and he would swallow again. In fact, I had my residents with me and pointed it out to them also and they observed it.

J.A. 1022–23. On cross-examination, Dr. Schwartz-Watts stated she did not believe Allen was malingering. J.A. 1035.

Dr. Corvin evaluated Allen on five occasions. J.A. 603–06. He opined that Allen suffered from schizophrenia and explained why he previously diagnosed Allen with schizoaffective disorder. J.A. 606–08. "From a forensic standpoint," Dr. Corvin explained, Allen's many psychiatric hospitalizations are significant because "the symptoms . . . described [] are . . . very, very consistent in their entirety with prodromal schizophrenia[8]. . . . [W]hat you see are many repeated diagnoses of depressive illnesses

---

[8] Dr. Crawford described "prodromal schizophrenia" as the beginning stage of schizophrenia. J.A. 613. She quoted the DSM-IV: "The onset may be abrupt or insidious, but the majority of individuals display some type of prodromal phase manifested by the slow and gradual development of a variety of signs and symptoms such as social withdrawal, loss of interest in school or work, deterioration in hygiene and grooming, unusual behavior and outbursts of anger. Family members may find this behavior difficult to interpret and assume that the person is going through a phase." *Id.* "This is [] Allen's history," Dr. Crawford said. *Id.*

21

one way, shape, form or fashion on top of the rumination disorder, which is, as the Court has heard, an unusual psychiatric illness." J.A. 624–25. "In fact, this is the first case I've ever seen of rumination of this sort," Dr. Corvin said. J.A. 625. Dr. Corvin also testified that he did not believe Allen was malingering. J.A. 640.

Next up was Dr. Harding. He discussed Allen's course of treatment since 1997. He also explained that "[f]rom a psychiatric standpoint," rumination is a "form of self comfort," "a way of keeping control on emotions," and "a calming kind of activity that is effective for the people who do it." J.A. 541–42.

In addition, forensic psychologist Dr. James Hilkey examined Allen for about 12 hours, conducting a battery of psychological tests prior to the North Carolina sentencing. Dist. Ct. Dkt., ECF No. 23 at Pg ID 109. Dr. Hilkey concluded that Allen has a paranoid-type schizophrenia, rumination disorder, and borderline personality disorder with obsessive-compulsive and anti-social features. *Id.* at Pg ID 115. He had another expert confirm, by blind analysis, that Allen was "a person who has some exaggeration, but a person who was suffering from schizophrenia and was psychotic."[9] *Id.* at Pg ID 478–79.

The reports of psychologist Dr. Vasudha Gupta and psychiatrist Dr. Gordon Lavin were also entered into evidence during the penalty phase of the South Carolina trial. J.A. 783–86. Dr. Gupta interviewed Allen in November 2002, after he was admitted to Central

---

[9] Sometime after Allen's North Carolina sentencing, Dr. Hilkey was contacted by Allen's South Carolina trial counsel. Dist. Ct. Dkt., ECF No. 23 at Pg ID 73. Dr. Hilkey met with trial counsel and reevaluated Allen, at their request. *Id.* at Pg ID 73–74. Trial counsel had Dr. Hilkey on standby during the South Carolina proceeding, and though they did not call him to testify, they entered Dr. Hilkey's North Carolina report into evidence during the penalty stage. *Id.* at Pg ID 76, 78, 80; *see also* J.A. 1222–25, 1554, 1603.

Prison Mental Health following his crimes. Dist. Ct. Dkt., ECF No. 65-24 at Pg ID 270. He diagnosed Allen with psychotic disorder, among other conditions. *Id.* at Pg ID 272. Dr. Lavin, who also worked at Central Prison Mental Health, also interviewed Allen around that time and diagnosed him with psychotic disorder. *Id.* at Pg ID 257. But in August 2003, Dr. Lavin determined that, while Allen had anti-social personality disorder, "[h]is claims of auditory hallucinations and other psychotic symptoms are assessed as malingered." *Id.* at Pg ID 265.

The government called five mental health experts in rebuttal: forensic psychiatrist Dr. Karla deBeck, forensic psychologist Dr. David Hattem, forensic psychologist Dr. Camilla Tezza, psychiatrist Dr. Majonna Mirza, and forensic psychiatrist Dr. James Ballenger.[10] These experts generally agreed that Allen has anti-social personality disorder, but believed that he was malingering with respect to schizophrenia symptoms. None of the government experts challenged Allen's diagnosis with rumination disorder.

Dr. deBeck spent 10 to 15 hours with Allen pursuant to the North Carolina court's order for a psychiatric evaluation to assess criminal responsibility. J.A. 1257, 1299–30. Dr. deBeck's "primary diagnosis" was anti-social personality disorder. J.A. 1273–74. She noted Allen had a history of rumination and conceded, during cross examination, that she had "no idea" if he still has it. J.A. 1323. She also diagnosed him with malingering, J.A.

---

[10] Dr. Ballenger never met with or interviewed Allen. J.A. 1058. The sentencing judge found his testimony to be "contrived and unreliable" and, accordingly, gave the testimony "little weight, if any." J.A. 1604–05.

23

1274, but agreed that "even if a person malingers or exaggerates or fakes symptoms for some gain, they can still suffer from a mental illness," J.A. 1295. Still, she concluded that Allen did not have symptoms of schizophrenia, schizoaffective disorder, or any other psychotic disorder on or prior to August 2003 (the last time she saw Allen). J.A. 1296, 1308. She did not express any opinion as to whether Allen had a psychotic disorder any time after August 2003. And during cross-examination, Dr. deBeck made clear that she conducted an evaluation regarding his mental state during the North Carolina crimes—she did not evaluate him as to the South Carolina crimes. J.A. 1309.

Dr. Hattem evaluated Allen in August 2003 pursuant to Dr. deBeck's request. J.A. 1382. Dr. deBeck requested that he review Allen's past test results and conduct any additional tests he felt necessary. J.A. 1391–92. Dr. Hattem concluded that Allen "was over endorsing symptoms, possibly in an [] attempt to malinger, but in any case not validly reporting symptoms." J.A. 1412. In addition, he conceded the following during cross-examination:

> Q: [T]he testing . . . [for] malingering, that . . . . does not determine whether or not a person has a mental illness?
>
> A: If somebody is malingering, it does not determine whether or not they have a mental illness." . . .
>
> Q: You do not have an opinion today as to whether [] Allen is presently mentally ill, correct?
>
> A: That's correct. I do not.
>
> Q: And you did not have an opinion when you did your evaluation as to whether in fact [] Allen was mentally ill at that time. Is that correct?
>
> A: That's correct.

24

> Q: Nor do you have an opinion as to whether Mr. Allen was mentally ill at the time of the crimes either in North Carolina or South Carolina?
>
> A: I do not.

J.A. 1412, 1416.

Dr. Mirza evaluated Allen in December 2004. J.A. 1470. She diagnosed Allen with anti-social personality disorder and concluded that he was malingering as to psychosis disorder symptoms. *See* J.A. 1471, 1479–80 (noting that (i) Allen was admitted with symptoms of auditory hallucinations and suicidal ideation; (ii) she discontinued antipsychotics to "rule out psychosis"; and (iii) auditory hallucinations that resolve without medication "would be very hard to ascribe" to an "Axis [I]" "mental health" disorder).

Dr. Tezza evaluated Allen in November 2004 pursuant to Dr. Mirza's request. J.A. 1421. Dr. Mirza requested a psychological consultation to rule out malingering of psychosis. J.A. 1422. Dr. Tezza determined that Allen was malingering psychotic disorder symptoms and found no evidence of schizophrenia. J.A. 1433, 1434. But he found evidence of anti-social personality and borderline personality disorders. J.A. 1434–36. He also noted that "the problem with malingering" is that "[y]ou cannot be entirely sure that someone doesn't have a severe mental disorder. You can know they're malingering but sometimes malingering can obscure diagnosis." J.A. 1433–34. During cross-examination, Dr. Tezza confirmed that "[she] [was] [] consulted for a specific purpose by [Dr. Mirza]." J.A. 1457. Trial counsel asked, "Not to diagnosis mental illness but to rule out malingering?" *Id.* "That's correct," Dr. Tezza admitted. *Id.* Trial counsel followed-up, "And that's all you did?" *Id.* "That's correct," Dr. Tezza said. *Id.*

25

In closing, the government conceded that Allen has anti-social personality disorder and argued: "Schizophrenia? The State submits it's a joke. . . . This man has no schizophrenia; the State submit[s] at any time, but especially in 2002." Dist. Ct. Dkt., ECF No. 19-5 at Pg ID 467, 488, 493. The government did not discuss any other mental illness.

Trial counsel began its closing by stating: "[T]his is not a question of whether he knew right from wrong. This has been an issue that, respectfully, Your Honor, has distorted this entire process . . . [over] these past two weeks. If he . . . didn't know the difference between right and wrong, we wouldn't be here. You would never reach the penalty phase . . . of a death penalty trial if he didn't know the difference." *Id.* at Pg ID 499–500. Rather, the question is whether Allen deserves death considering that "the death penalty is for the worst of the worst crimes and for the worst of the worst criminals." Dist. Ct. Dkt., ECF No. 19-6 at Pg 33. Trial counsel further argued that "the question for the Court is: Is he mentally ill?" *Id.* at Pg ID 13. And "to suggest that because he exaggerates sometimes means he's not mentally ill is just wrong," counsel argued. *Id.* at Pg ID 14. Trial counsel also summarized Allen's "completely undisputed" childhood abuse, which they argued "by itself is mitigating in the extreme." *Id.* at Pg ID 24–33; Dist. Ct. Dkt., ECF No. 19-5 at Pg ID 35, 500. "That's a reason for life. . . . [Y]ou don't ignore the first 20 years of his life when you're deciding whether he gets life or death." Dist. Ct. Dkt., ECF No. 19-5 at Pg ID 35.

## E.

On March 18, 2005, after 10 days of testimony, the judge sentenced Allen to death. In the Oral Sentencing Order, the sentencing judge explained in relevant part:

26

In considering the outcome of this sentencing hearing[,] I have tried to understand the unique forces and events which have put Mr. Allen in the situation in which he finds himself today. I have considered his upbringing so masterfully chronicled by Debra [sic] Grey. I've considered his list of mental illness [sic] as described by Dr. Pam Crawford. . . .

Mr. Allen raises the issue of mental illness as his reason for avoiding the death penalty. His attorneys argue that due to his diagnosed mental illness his culpability was diminished and no retributive or deterrent effect would be served by the imposition of the death penalty.

Addressing the issue of mental illness, I have not seen convincing evidence that Mr. Allen had a major mental illness at the time of the crimes in 2002. I have seen a series of short-stay hospitalizations from 1997, 1998 and 1999, but no recognition of a mental illness that required or demanded a treatment program.

If he had a major mental illness in 1997 or 1998 or 1999, then the mental illness community failed him and failed this community. His sole form of treatment was to give him some pills and send him away. This leads me to believe that his mental condition and behavior were primarily a reaction to a very poor and destructive home life as a child from which he chose to act out in ways that would garner attention for himself, whether by being annoying, or childish or aggravating.

His subsequent actions of attempting to kill James White and ultimately killing Dale Hall were, I believe, a result of his desire to be noticed and respected. And if he had a major mental illness at that time in 2002, no one, not even his psychiatrists, were aware of it. . . .

Th[is] lead[s] me to believe that if indeed he had schizophrenia, it was not evident and the disease did not control his mind to such a degree as to exonerate or lessen the culpability of his actions.

And what is Mr. Allen's condition today? I have listened to and read the accounts of all of the psychiatrists and psychologists in this case: Doctors Hilkey, Gupta, Lavin,

27

DeBeck [sic], Hattem, Crawford, Mirza, Tezza, Corvin and Schwartz-Watts.

Quite frankly, I cannot tell with certainty what his mental state is today. I know he is on medication. I have observed him sitting quietly at counsel table, making notes, reading a dictionary, and not exhibiting any unusual or bizarre behavior. I have noticed him communicating with counsel and on occasion, smiling. He has always had a neat and well-groomed appearance.

Yet, three respected psychiatrists, Dr. Corvin, Dr. Crawford, and Dr. Schwartz-Watts have testified that as he sits here today he has a major mental illness characterized by delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms, such as affective flattening, alogia, or avolition. And maybe he does, although his outward appearance belies such a condition.

On the other hand, I have heard Dr. DeBeck [sic] and Dr. Hattem say that in August 2003, their diagnosis was that he was malingering. Dr. DeBeck [sic] said, "Mr. Allen did not show symptoms of a psychiatric disorder during his hospital stay, despite being off antipsychotics since April 11th, 2003."

Dr. Tezza and Dr. Mirza also testified that on December 3rd, 2004, they found that Mr. Allen was malingering when sent to Just Care by the Richland County Detention Center. . . .

These contrary opinions lead me to no firm conclusions as to Mr. Allen's mental state at this time.

J.A. 1600–05.

The sentencing judge then cited *Ake v. Oklahoma*, 470 U.S. 68 (1985), for the proposition that "because 'psychiatrists disagree widely and frequently on what constitutes mental illness and on the appropriate diagnosis to be attached to given behavior and symptoms,' the fact finder must resolve differences in opinion . . . on the basis of the evidence offered by each party when a defendant's sanity is at issue in a criminal trial."

28

J.A. 1605–06 (quoting *Ake*, 470 U.S. at 81). He went on to discuss Supreme Court decisions prohibiting capital punishment for the mentally incompetent, insane, and youth under 18 years old. J.A. 1606–09 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005); *Ford v. Wainwright*, 477 U.S. 399 (1986)).[11] The sentencing judge then recited South Carolina's two-prong test for determining whether a defendant is competent to be executed.[12] J.A. 1609–10 (citing *Singleton v. State*, 437 S.E.2d 53 (S.C. 1993)). The trial judge ultimately determined that, "in light of the lack of guiding principles dealing with the imposition of the death penalty on persons with mental illnesses, the Court can only look to the *Singleton* principles as a guide"—principles the trial judge also described as "the appropriate test in South Carolina for execution of the mentally ill." J.A. 1610, 1638 (quoting *Singleton*, 437 S.E.2d at 58). Ultimately, "[he] [saw] [] nothing in the course of the t[he] trial to convince [him] that the defendant cannot meet this [two]-prong test." J.A. 1620.

The sentencing judge wrestled with whether Allen's actions were driven by fate, mental illness, or free will. J.A. 1620–23. He then considered deterrence and retribution before announcing Allen's sentence. J.A. 1624–25.

---

[11] The trial judge began his discussion of *Ford v. Wainwright* with the following question: "So what is the state of the law as it applies to mental illness?" J.A. 1608.

[12] The sentencing judge explained: "The first prong can be characterized as the cognitive prong, which is defined as the ability to recognize the nature of the punishment and the reason for the punishment." J.A. 1636. "The second prong is characterized as the assistance prong, which is defined as the ability to assist counsel or the court in identifying exculpatory or mitigating information." J.A. 1636–37.

29

About two weeks after the sentencing, the sentencing judge memorialized his findings in a written sentencing report dated April 1, 2005 ("Post-Sentencing Report").[13] J.A. 1935–48.

Question #8 of Section A ("Data Concerning the Defendant") asked: "Was a psychiatric evaluation performed?" J.A. 1935. The sentencing judge marked, "Yes." *Id.* Subsection 8(a) asked: "If performed, by whom?" J.A. 1936. The sentencing judge wrote: "Dr. Pam Crawford." *Id.* Subsection 8(b) asked, "Able to distinguish right from wrong?" and, "Able to cooperate intelligently in his own defense?" *Id.* The sentencing judge marked, "Yes" as to both questions. *Id.* Subsection 8(c) asked: "If performed, were character or behavior disorders found?" *Id.* The sentencing judge marked, "Yes." *Id.* It then asked: "If yes, please elaborate." *Id.* Next to this question, the sentencing judge wrote a single word: "Schizophrenia." *Id.* Three lines demarcated for additional text remained bare. *Id.*

Question #3 of Section D ("Data Relating to Sentencing Proceeding") asked: "Was (were) the aggravating circumstance(s) found supported by the evidence?" J.A. 1942. The sentencing judge marked, "Yes" next to that question.[14] *Id.* Question #4 asked: "Was

---

[13] Whenever the death penalty is imposed, South Carolina Code § 16-3-25(A) requires the trial court, within ten days after receiving the sentencing transcript, to transmit a report prepared by the trial judge. The report is in the form of a standard questionnaire prepared and supplied by the Supreme Court of South Carolina. S.C. Code § 16-3-25(A); Resp. Br. at 9, n.5 (describing the Post-Sentencing Report as "statutorily required").

[14] As to Dale Hall, the trial judge marked the boxes associated with (i) "Kidnapping"; (ii) "Larceny with use of a deadly weapon"; (iii) "Physical torture"; and (iv) "Murder was committed by a person with a prior record of conviction for murder." J.A. (Continued)

there evidence of mitigating circumstances found supported by the evidence?" *Id.* Next to that question, the trial judge marked, "No." *Id.* Question #5 read: "If so, which of the following mitigating circumstances was in evidence?" *Id.* The sentencing judge placed an "X" next to three categories concerning "influence of mental or emotional disturbance," "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," and "age or mentality . . . at the time of the crime(s)," and also placed an "X" next to the category labeled "Other." J.A. 1942–43. It then stated: "Please explain if [Other] is checked." J.A. 1943. To this, the sentencing judge wrote: "Conclusive proof of mitigating circumstances was not found. Numerous psychiatrists and psychologists testified to conflicting diagnoses of the Defendant's mental health." *Id.*

In the sworn Post-Sentencing Affidavit drafted seven months after sentencing, the sentencing judge wrote: "Mr. Allen was NOT conclusively diagnosed to be mentally ill." J.A. 2010.

## II.

## A.

Allen raised several issues on direct appeal. *See* J.A. 1933. The Supreme Court of South Carolina affirmed his convictions and sentence, *State v. Allen*, 687 S.E.2d 21 (S.C.

---

1935–48. The form did not have an option to mark "dismemberment" and that statutory aggravating circumstance was not noted anywhere in the Post-Sentencing Report. As to Jedediah Harr, the trial judge marked the boxes associated with (i) Murder was committed by person with a prior record of conviction for murder" and (ii) "The offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person." J.A. 140–41.

2009), and the United States Supreme Court denied his petition for writ of certiorari, *Allen v. South Carolina*, 560 U.S. 929 (2010).

Allen filed for post-conviction relief ("PCR") in the Richland County Court of Common Pleas. He raised various claims relating to the validity of his guilty plea and the constitutionality of his sentencing proceeding. Specifically, Allen argued that his guilty plea was involuntary because it had been induced by a promise of a life sentence from the judge. In the alternative, Allen argued that if the judge *hadn't* made such a promise, then his lawyers rendered ineffective assistance of counsel in advising him to plead guilty without adequate assurance that there was any benefit to doing so. On the sentencing front, Allen argued that the sentencing court made various constitutional errors in weighing the aggravating and mitigating factors before imposing the death sentence, including that it failed to consider all of his mitigating evidence, instead improperly focusing only on whether he was competent to be executed. J.A. 2542–45.

The Honorable R. Ferrell Cothran, Jr., Circuit Court Judge, was assigned to the case. *See* J.A. 2165. After Allen attempted to waive his appellate rights, Judge Cothran ordered him to undergo a competency evaluation. J.A. 2207. On January 15, 2014, Judge Cothran conducted a competency hearing, at which Dr. Richard Frierson opined that Allen was competent to proceed with his PCR action and Allen subsequently withdrew his request. *Id.* But, on February 2, Allen attempted suicide by slicing his arm open. *Id.* He received 22 stitches and, shortly thereafter, began spreading false information to sabotage his case. *Id.* Judge Cothran noted: "He is refusing to take medications that could address his depressive symptoms. Allen has a very long, and well documented history of

32

attempting suicide." *Id.* Finding Allen incapable of acting in his own self-interest, Judge Cothran assigned Allen a guardian. *Id.*

Judge Cothran held an evidentiary hearing and, on December 1, 2015, adopted a proposed opinion and order drafted by the government and denied relief. J.A. 2530–89. First, addressing the challenges to Allen's guilty plea, the court determined that while the sentencing judge "may have indicated an inclination" toward a life sentence, counsel understood there was no guarantee, and that they "would have to convince the court of the existence of a significant mental illness." J.A. 4202–03. The court emphasized Allen's own testimony, at the evidentiary hearing, denying that anyone had promised him a life sentence. J.A. 2558–60. And in light of all the circumstances, the court found, Allen had received effective assistance of counsel because pleading guilty was a sound strategic decision.

The court also rejected Allen's claims that the sentencing judge failed to consider Allen's mitigating circumstances and "confus[ed] the competency to be executed standard with the standard for finding [a defendant] to be mentally ill," J.A. 2632, 2633–34, explaining:

> Judge Cooper's statement where he discussed the failure to show that [Allen] met the standards of competency to be executed . . . does not indicate that Judge Cooper declined to consider the mitigation evidence as presented. Rather the order expresses a conclusion that Judge Cooper did not give the evidence of mental illness the weight that [Allen] wanted him to give. . . . [C]onsideration of the evidence was properly given[.] . . . The transcript is [] fairly read to reflect a global assessment of the facts and circumstances before the sentencing judge, which he considered, weighed and narrowed, until arriving at his sentencing conclusion.

33

J.A. 2582. Judge Cothran denied Allen's subsequent motion to alter or amend the state

court order. *See* J.A. 2640.

On April 19, 2018, the Supreme Court of South Carolina denied Allen's Amended

Petition for Writ of Certiorari "on the merits" in an unexplained order. *See* J.A. 2642.

Allen sought rehearing, which the court denied. *See* J.A. 2681.

B.

Allen filed a timely petition for a writ of habeas corpus in the United States District

Court for the District of South Carolina, asserting nine claims under 28 U.S.C. § 2254,

including:

> Mr. Allen's rights under the Sixth, Eighth, and Fourteenth
> Amendments were violated because the trial judge [(i)] failed
> to find that any mitigating circumstance had been established
> and [(ii)] used an impermissibly high standard for determining
> whether Mr. Allen suffered from mental illness . . . .

J.A. 19. He also renewed his challenges to his guilty plea. J.A. 20. On March 25, 2020,

the district court dismissed the petition. J.A. 11–95, 2768.

As to Allen's mitigation evidence claim, the district court explained that the record

before the state court rebutted Allen's assertions that "[the sentencing judge] failed to

discuss [Allen]'s life history" and "focused solely on whether Petitioner was mentally ill

at the time he committed the crimes or at the time of trial." J.A. 32. The district court

further explained:

> [T]he Constitution does not require a capital sentencer to find
> the existence of a mitigating factor, only to consider all of the
> evidence offered in mitigation. Here, Judge Cooper explicitly
> stated he considered the evidence of Petitioner's abusive
> childhood and alleged mental illness in reaching his decision.

34

> He went on to discuss some of that evidence in detail and describe how he assessed it. Judge Cooper's decision to grant that evidence little weight does not rebut the record's clear indication that he did, in fact, consider it.

J.A. 37.

Turning to the challenges to Allen's guilty plea, the court concluded that there had been no constitutional error. Disagreeing in part with the PCR court, the district court concluded that the sentencing judge made a promise, or at least an implicit assurance, of a life sentence. J.A. 47, 47–48 n.9. This finding defeated the ineffective assistance of counsel claim because the court concluded that, having received that assurance, trial counsel made a reasonable strategic decision to advise Allen to plead guilty. J.A. 48, 51. With respect to the voluntariness of the guilty plea, the district court concluded that no promise had been relayed to Allen by his counsel or by the judge, and thus he had not relied on any improper inducement in deciding to plead guilty. J.A. 53. Acknowledging that the questions were close, however, the district court issued a certificate of appealability on these two claims.

Allen timely noted this appeal, and we granted his motion to expand the certificate of appealability ("COA") to include the mitigation evidence issue.[15]

---

[15] The COA also included the following four issues: (i) "Trial Counsel were ineffective in violation of [] Allen's rights under the Sixth and Fourteenth Amendments because they advised him to plead guilty without adequate assurances from the judge"; (ii) "[]Allen's guilty plea was involuntary, in violation of the rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments, because the trial judge indicated to counsel that he would impose a life sentence if [] Allen pled guilty to two counts of capital murder and [] Allen relied on that assurance in pleading guilty"; (iii) "[] Allen's Sixth, Eighth, and Fourteenth Amendment rights were violated where the judge sentenced him to death (Continued)

35

As explained below, we reverse the district court's decision as to Allen's mitigation evidence claim.[16]

### III.

We review de novo a district court's dismissal of a habeas petition. *Grueninger v. Director, Virginia Dep't of Corr.*, 813 F.3d 517, 523 (4th Cir. 2016). When a state court has adjudicated a petitioner's claim on the merits, we apply the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standard of review, under which a petitioner is entitled to relief only if the state court adjudication of their claim was (i) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (ii) "based on an unreasonable determination of the facts in light

---

without finding that the statutory aggravating factors were proven beyond a reasonable doubt"; and (iv) "The sentencing judge's reliance on the deterrent effect a sentence of death might have on other abusive mothers violated the Eighth Amendment's protection against the consideration of an arbitrary factor in determining the penalty." J.A. 95, 2961.

[16] Allen also appeals the district court's ruling that his guilty plea was voluntary and that he received effective assistance of counsel in rendering that plea. Like the district court, we are troubled by the events preceding Allen's guilty plea, including the *ex parte* meeting with the sentencing judge. However, in light of the deferential standard under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we agree with the district court that the PCR court did not unreasonably find that Allen's lawyers were not ineffective and that the guilty plea was not involuntary. Even if it is the case that the lawyers reasonably perceived they had received a promise of a life sentence, we agree with the district court that *Allen* did not receive or rely on any such promise, as his own testimony made clear. And with or without a promise, we agree with the district court that it would be a reasonable strategic choice to recommend a guilty plea under the circumstances. With this understanding of the facts, the PCR court's decision is not contrary to any clearly established federal law.

36

of the evidence presented." *Long v. Hooks*, 972 F.3d 442, 457–58 (4th Cir. 2020) (en banc) (quoting 28 U.S.C. § 2254(d)).

A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) when it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

A state court's decision involves an "unreasonable application" of clearly established federal law under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "In order for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S.Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks omitted). This means that to obtain relief, "a litigant must show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (alterations and internal quotation marks omitted).

Similarly, when a petitioner alleges that a state court based its decision on an "unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding" under § 2254(d)(2), the question is not whether the state court's determination was incorrect but whether it is "sufficiently against the weight of the

37

evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010). A state court's factual determinations are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, even if constitutional error occurs, habeas relief will not be granted unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). However, "[i]f we are in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail." *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

In assessing a petitioner's habeas claims, we look to "the last reasoned decision of a state court addressing the claim." *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017) (internal quotation marks omitted). Thus, we look to trial court's decision on PCR review. In this case, even if we assume the most stringent AEDPA standard applies, we conclude that Allen has met his burden.

## IV.

### A.

We begin by discussing the clearly established law at issue. The Eighth Amendment bars the arbitrary imposition of the death penalty, *Beard v. Banks*, 542 U.S. 406, 421 (2004), because death—"the most irremediable and unfathomable of penalties"—is different, *Ford*, 477 U.S. at 411 (citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

38

Decades of back-and-forth between legislative enactments and jury determinations—"the two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society"—"point[s] conclusively to [a] repudiation of automatic death sentences." *Woodson*, 428 U.S. at 293. Well-established capital punishment jurisprudence recognizes "the fundamental respect for humanity underlying the Eighth Amendment" and, thus, "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304 (internal citation omitted).

To this end, any sentence imposed in a capital case must be a "reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). The constitutional demand for a reasoned moral response requires a sentencing scheme to satisfy two criteria—one governs the character of the evidence placed before the decisionmaker, and the other goes to the substantive justification that must undergird a death sentence.

As to the first criteria, the decisionmaker must be presented with evidence that permits an informed sentencing choice—specifically, the evidence must speak to the crime committed and the specific individual who committed it. *Id.* Of course, a defendant must be permitted to place any constitutionally relevant mitigating evidence in the decisionmaker's hands. *Id.* at 318–19. In determining whether mitigating evidence is "relevant" in the penalty phase of a capital case, the broad evidentiary standard for

39

relevance applies. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)) (internal quotation marks omitted). "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value." *McKoy*, 494 U.S. at 440 (internal quotation marks omitted). So certain evidence that does "not relate specifically to petitioner's culpability for the crime he committed" may nevertheless "be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'" *Tennard*, 542 U.S. at 285 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (internal quotation marks omitted).

Second, "[o]nce this low threshold for relevance is met," the decisionmaker must weigh the aggravating and mitigating evidence to determine whether sentencing a particular defendant to death is the morally rational and justifiable result. *Id.*; *see also Lockett*, 438 U.S. at 604. This is because capital punishment must be reserved for "the worst of the worst." *Roper*, 543 U.S. at 568. It "must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* (quoting *Atkins*, 536 U.S. at 319). Put simply, a constitutionally valid capital sentencing scheme "eliminates the risk that a death sentence will be imposed in spite of facts calling for a lesser penalty." *Penry*, 492 U.S. at 328–29.

But mere "consideration" of mitigating evidence—in the sense that such evidence is *presented* to the decisionmaker—is not enough to satisfy the Eighth Amendment's dictates. Sentencers "must be able to give *meaningful* consideration and effect to *all*

40

mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added); *see also Brewer v. Quarterman*, 550 U.S. 286, 295 (2007) (requiring sentencer to give "full effect" to mitigating evidence). For example, in *Abdul-Kabir*, the trial court instructed the jury to decide only two special issues: (i) whether the defendant's criminal conduct was "committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and (ii) whether there was "a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society." 550 U.S. at 238. Though Abdul-Kabir presented mitigating evidence from mental health experts related to his troubled childhood and lack of impulse control, the trial court refused Abdul-Kabir's requested jury instructions, which would have permitted a negative answer to either of the special issues based on his mitigating evidence. *Id*. at 239–40, 242. The jury answered "yes" to both special issues, and Abdul-Kabir was sentenced to death. *Id.* The Supreme Court concluded that this sentencing scheme amounted to an end-run around the Eighth Amendment's protections. Abdul-Kabir's mitigating evidence had relevance to his moral culpability beyond the scope of the two special questions in the Texas statute, the Supreme Court explained, and a sentencing process that does not "provide the [decisionmaker] with a vehicle for expressing its 'reasoned moral response'" "to a defendant's mitigating evidence" is "fatally flawed." *Id.* at 252–53, 256–67, 264 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 185 (1988) (O'Connor, J., concurring)).

"Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (internal quotation marks omitted); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982). The sentencer "may determine the weight to be given relevant mitigating evidence," but "may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114–15. And the sentencer may not screen out mitigating evidence that meets the minimal relevance standard by imposing more stringent requirements on valid evidence. *See Tennard*, 542 U.S. at 287 (holding that state may not require mitigating evidence to have some nexus to the crime). As this Court has explained before, "the Supreme Court [is] [] very sensitive to any impediment to the consideration of any type of mitigating evidence in a death sentencing hearing." *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983) (citations omitted).

At bottom, when state law permits a decisionmaker to determine whether a defendant shall live or whether he shall die, the Constitution does not permit "the risk of an unguided emotional response" to the ultimate issue. *Penry*, 492 U.S. at 328. Rather, "[f]ull consideration of evidence that mitigates against the death penalty is essential if the [decisionmaker] is to give a reasoned moral response to the defendant's background, character, and crime." *Id.* at 319 (emphasis added).

B.

We now turn to the mitigation evidence claim before us. Allen contends that the sentencing judge (i) "refus[ed] to consider and give effect to [] [his] mitigating evidence" as demonstrated by "[the] failure to find any mitigating circumstances" and (ii) "imposed

42

an unconstitutionally restrictive burden on [] consideration of [] [his] mental health evidence" by requiring proof of insanity or incompetence.  Op. Br. at 53–54.  Allen argues that the latter action required him to be "categorically ineligible for death before . . . any effect to the mental health mitigating evidence" would be given, rendering the aggravator-mitigator balancing "illusory."  Op. Br. at 53–56.

The PCR court reached a different conclusion.  It reasoned that the sentencing judge "consider[ed] the mitigation evidence as presented" but just "did not give the evidence of mental illness the weight that [Allen] wanted him to give."  J.A. 2582.  And ultimately, the state court concluded, "consideration of the evidence was properly given."  *Id.*

But the analysis is not as simple as stating that the sentencing judge "considered" Allen's mental health evidence "properly" or "as presented" and, therefore, no constitutional violation occurred.  If the record before the state court shows clearly and convincingly that the trial court did not consider and give effect to *all* of Allen's mitigating evidence, the state court's conclusion that the trial court "consider[ed] the mitigation evidence as presented" constitutes an unreasonable determination of the facts and its conclusion that such consideration was "proper" would contravene clearly established federal law.  Furthermore, if the sentencing judge failed to give "*meaningful* consideration and effect" to all of Allen's mitigating evidence, the state court's conclusion that such consideration was "proper" contravenes clearly established federal law.

It does not matter which of these things happened here because one is as arbitrary and constitutionally improper as the other.  In the end, when placed against the backdrop of the record and considered within the bounds of clearly established federal law, the state

43

court's conclusion that the sentencing judge "properly considered" Allen's mitigating evidence was in error.

1.

Our examination of the record compels us to conclude that the sentencing court did not consider all of Allen's mitigating evidence. Thus, the PCR court's critical factual determination—that the trial court "consider[ed] the mitigation evidence as presented"—was objectively unreasonable. With this cracked factual foundation exposed, we conclude that the state court's determination that the sentencing judge "properly" considered Allen's mitigating evidence was contrary to clearly established federal law.

First, in the Post-Sentencing Affidavit, the sentencing judge states outright: "Allen was NOT conclusively diagnosed to be mentally ill." J.A. 2010. No doubt, we are bound by the sentencing judge's sworn declaration as to this factual finding. The problem is that the record plainly and unequivocally belies this conclusion. The government's own experts conclusively diagnosed Allen with rumination disorder; the government conceded as much during oral argument. And Dr. Crawford could not have been clearer when she said "[Allen] is mentally ill now" and "[he] was mentally ill" in the summer of 2002. J.A. 763, 774; *see also* J.A. 761, 764, 810, 850, 853, 862, 963–64, 967. Dr. Corvin and Dr. Schwartz-Watts were just as clear when they said the same. J.A. 621, 640, 653–54, 701, 1022.

And no government rebuttal expert said different. Dr. Hattem had no opinion about whether Allen was mentally ill as of the date of Dr. Hattem's testimony, at the time he conducted the evaluation, or at the time of the South Carolina crimes. J.A. 1412. Dr. Tezza confirmed that "[she] [was] [] consulted for a specific purpose" and that purpose was "*not*

44

to diagnose mental illness." J.A. 1457 (emphasis added). Dr. Mirza testified that Allen was malingering as to *psychosis* disorder symptoms; he made no conclusions as to any other mental health disorder. *See* J.A. 1471, 1479–80. And Dr. deBeck also concluded that Allen was malingering as to *psychosis* disorder symptoms, offered no opinion as to whether Allen was malingering as to any other Axis I mental health issue, and admitted that individuals can malinger and still be mentally ill. J.A. 1295–96, 1308.

The sentencing judge could not have concluded that "Allen was NOT conclusively diagnosed to be mentally ill," J.A. 2010, without excluding uncontested mitigating evidence. We cannot be bound by the sentencing judge's finding that Allen had no conclusively diagnosed mental illness and conclude anything other than that Allen's conclusively diagnosed rumination disorder was excluded. At bottom, the sentencing judge could not have considered mitigating factors that the sentencing judge swore did not exist. Any other conclusion would be objectively unreasonable.

Second, in the Post-Sentencing Report, the sentencing judge concluded that there "[were] [] aggravating circumstance(s) found supported by the evidence." J.A. 1942. He then concluded that there was "[no] evidence of mitigating circumstances found supported by the evidence." *Id.* But there *was* evidence of mitigating circumstances supported by the evidence: Allen suffered from rumination and anti-social personality disorders and endured persistent childhood abuse. No expert or party debated these mitigating circumstances. That the sentencing judge found that the evidence presented did not support the existence of mitigating circumstances, despite undisputed expert testimony regarding

45

two disorders and childhood abuse, shows that the sentencing judge excluded the uncontroverted expert testimony from the analysis.

Third, the sentencing judge *again* emphasizes that no mitigating circumstances existed when articulating why he found "[no] evidence of mitigating circumstances [was] [] supported by the evidence." *Id.* After acknowledging that trial counsel placed several pieces of mitigating evidence on the record—including the "influence of mental or emotional disturbance," "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," and "age or mentality . . . at the time of the crime(s)"—the sentencing judge explained that "[no] evidence of mitigating circumstances [was] found supported by the evidence" because "[c]onclusive proof of mitigating circumstances was not found." *Id.*

But again, what of Allen's rumination disorder, anti-social personality disorder, and childhood abuse? Aren't these circumstances potentially mitigating as a matter of law? *See Abdul-Kabir*, 550 U.S. at 262 (explaining that evidence of "mental illness, substance abuse, and a troubled childhood" have "mitigating qualities"). Didn't all experts who testified about these mitigators agree? Doesn't a lack of conflicting testimony as to a fact create "conclusive proof" of that fact? The only way to reconcile the sentencing judge's conclusion that no conclusive proof of mitigating circumstances existed with the conclusive proof of Allen's rumination and anti-social personality disorders, as well as childhood abuse, is to conclude that the sentencing judge did not consider these mitigators.

Fourth, per the Post-Sentencing Report, "a psychiatric evaluation [was] performed"; Dr. Crawford was the evaluator; and she found "character or behavior disorders." J.A.

46

1936. Yet, when asked to elaborate, the sentencing judge memorialized a single disorder: schizophrenia. *Id.* The Post-Sentencing Report is silent as to Allen's rumination disorder, an Axis I mental illness with which Dr. Crawford diagnosed Allen. It may be true, as the government argues, that sentencing judges are required to memorialize only aggravating—not mitigating—circumstances found to exist. But this specific portion of the Post-Sentencing Report does not concern *mitigators* found by the *sentencer*—it concerns "*character or behavior disorders*" found by the *psychological evaluator*. The government has not suggested that a sentencing judge can opt out of filling in all relevant portions of this report. Nor has the government suggested that a sentencing judge can cherry-pick which "character or behavior disorders" to memorialize for review by the South Carolina Supreme Court and which to omit. Indeed, the report contains three full lines upon which a sentencing judge can list the "character or behavior disorders found," suggesting that the South Carolina Supreme Court anticipates a full account of all disorders. That the sentencing judge left the three lines devoid of any mention of Allen's rumination disorder suggests that he did not consider this disorder when making the sentencing decision.

Fifth, that schizophrenia was the only mental health disorder the sentencing judge discussed during oral sentencing further supports the conclusion that schizophrenia was the only mental health condition under consideration. We acknowledge that the sentencing judge states that he "considered [Allen's] list of mental illness [sic] as described by Dr. [] Crawford." J.A. 1600. And of course, that a sentencing order does not refer to some mitigating factors does not mean that such evidence was not considered. But, when trying to ascertain "what [Allen's] mental state is *today*," the sentencing judge discusses what he

47

describes as the "major mental illness" of schizophrenia only. J.A. 1603 (emphasis added) ("Dr. Schwartz-Watts ha[s] testified that[,] as he sits here today[,] [Allen] has a major mental illness characterized by delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms, such as affective flattening, alogia, or avolition.")  Critically, the sentencing judge concludes that, because some government rebuttal witnesses opined that Allen may be malingering or exaggerating his *schizophrenic or psychosis* symptoms, he could come to "no firm conclusions as to [] Allen's mental state at [the] time [of sentencing]." J.A. 1605. But again, there were absolutely no contrary opinions as to Allen's rumination disorder, which is also an Axis I mental illness. This serves as further evidence that the sentencing judge swiped some of Allen's mitigating evidence off the table.

Sixth, during oral sentencing, the judge announced his sentencing decision by explaining in relevant part:

> After carefully considering all relevant facts and circumstances, including the *existence* of statutory aggravating circumstances as well as the *claim* of mitigating circumstances, this Court finds and concludes that the defendant shall be sentenced to death.

J.A. 2553–54 (emphasis added). But of course, Allen did not merely *claim* to have mitigating circumstances. Again, no expert disputed Allen's rumination and anti-social personality disorders; nor did any expert dispute his childhood abuse. So, these mitigators existed just as much as the aggravators did. Yet, the sentencing judge's final words following ten days of testimony suggests the exact opposite. This fact too supports the conclusion that the sentencing judge failed to consider Allen's uncontested mitigators.

48

On this record, therefore, the PCR court unreasonably determined that the sentencing court considered all the mitigating evidence. Although § 2254(d)(2) imposes a high bar for showing an unreasonable determination of the facts, we conclude that Allen cleared it. When the record is read in its entirety, it is clear that the sentencing judge considered Allen's disputed schizophrenia diagnosis only and paid no mind to the several uncontroverted mitigators.

We also note, as further support for this conclusion, that the PCR court failed to even consider the most probative piece of evidence of how the sentencing judge analyzed the mitigating evidence—his own statements memorialized in the Post-Sentencing Affidavit. When a state court during post-conviction review ignores evidence in the record placed before it, "its fact-finding process may lead to unreasonable determinations of fact under § 2254(d)(2)." *Gray v. Zook*, 806 F.3d 783, 791 (4th Cir. 2015) (citing *Moore v. Hardee*, 723 F.3d 488, 499 (4th Cir. 2013) (citing *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014))); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) (expressing concern that a state court "had before it, and apparently ignored" petitioner's probative evidence of a constitutional violation). Of course, "a state court need not refer specifically to each piece of a petitioner's evidence to avoid the accusation that it unreasonably ignored the evidence." *Id.* (citing *Moore*, 723 F.3d at 499). "Rather, to determine whether the state court considered or ignored particular evidence, the federal court must review 'the entirety of the [state] court's order.'" *Id.* (*Moore*, 723 F.3d at 499).

49

The record here demonstrates that the state court disregarded the Post-Sentencing Affidavit. The state court said as much in its opinion:

> This Court has also reviewed the affidavit of the Honorable G. Thomas Cooper. . . . [The affidavit] was a part of the direct appeal record and a part of the [r]eturn in the instant action . . . . In an abundance of caution, this Court has used its discretion to resolve not to consider the affidavit in regard to the allegations in this action. . . . [I]t is not necessary to resolve any claim in this action.

J.A. 2532, 2583–84.

Based on this statement, we must conclude that the state court did not consider the Post-Sentencing Affidavit as to any of the claims[17]—unless, of course, it stated or indicated otherwise. Interestingly, the state court did use the affidavit to hedge its decisionmaking, but it did so only as to three specific claims: (i) "Alleged Ineffective Assistance of Appellate Counsel," J.A. 2586; (ii) "Alleged Involuntary Guilty Plea Due to Trial Judge's Involvement in Plea," J.A. 2553; and (iii) "Alleged Involuntary Guilty Plea," J.A. 2584 ("[T]his Court recognizes that Judge Cooper's affidavit plainly rebuts and clarifies the earlier affidavit of Ms. Fielding Pringle and rebuts the affidavit of Mr. Robert Lominack, but it is not necessary to resolve any claim in this action. Critically, the affidavit does not contain any assertions that a promise was made such as would undermine the fairness of the proceeding if the affidavit would not be considered.")

---

[17] The district court thought the same, explaining: "[A]lthough the PCR court did not consider Judge Cooper's Affidavit, the Affidavit is part of the record before this Court." J.A. 48.

50

The state court said nothing at all about the Post-Sentencing Affidavit when deciding Allen's two-part mitigation evidence claim. This leads us to conclude that the Post-Sentencing Affidavit played no part in the outcome of this issue, which the state court analyzed in its opinion under Section (D) ("Alleged Ineffective Assistance of Trial Counsel"), Subsection (g) ("For Failing to Object to the Trial Court's Confusing of the Competency to be Executed Standard With the Standard for Finding Mental Illness"). J.A. 2581. The affidavit contained commentary about the judge's assessment of the mitigating evidence—most notable, his conclusion that "Allen was NOT conclusively diagnosed to be mentally ill," J.A. 2010—which bears directly on Allen's claim. "A rational fact-finder might discount [the affidavit] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it." *Gray*, 806 F.3d at 791 (quoting *Taylor*, 366 F.3d at 1006); *see also Taylor*, 366 F.3d at 1001 ("To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim.").

The state court's decision to ignore the Post-Sentencing Affidavit fatally undermined the fact-finding process.[18] The omission "[led] to unreasonable

---

[18] "What goes for juries goes no less for judges. In making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings. The process of explaining and reconciling seemingly inconsistent parts of the record lays bare the judicial thinking process, enabling a reviewing court to judge the rationality of the fact-finder's reasoning. On occasion, an effort to explain what turns out to be unexplainable will cause the finder of fact to change his mind. By contrast, failure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding." *Taylor*, 366 F.3d at 1007–08.

determinations of fact" because the PCR court overlooked highly probative evidence that the sentencing judge did not consider Allen's rumination diagnosis or history of childhood abuse. *See Gray*, 806 F.3d at 791.

We find clear and convincing evidence that the sentencing judge did not consider *all* of Allen's mitigating evidence, and therefore hold that the state court's determination that the sentencing judge "consider[ed] the mitigation evidence as presented" is an unreasonable determination of the facts because it is based on a factual finding that is plainly contradicted by the record. We thus do not defer to the state court's ultimate ruling on Allen's Eighth Amendment claim, predicated as it is on an unreasonable factual determination, and instead review that claim de novo. *See Dodson v. Ballard*, 800 F. App'x 171, 175–76 (4th Cir. 2020). Failing to consider some of a defendant's mitigating evidence, as the sentencing court did here, violates clearly established federal law. And it follows that the state court's conclusion that the sentencing judge "properly" considered Allen's mitigating evidence is contrary to clearly established federal law. In the end, "the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, [so] it is our duty to remand this case for resentencing." *Mills v. Maryland*, 486 U.S. 367, 375 (1988) (quoting *Eddings*, 455 U.S. at 117 n.13 (O'Connor, J., concurring)).

2.

Attempting to rationalize and breathe ambiguity into the sentencing judge's determination, the government maintains that the sentencing judge did not *exclude* any such evidence. Rather, the government asserted during oral argument that the sentencing

judge placed all such evidence on the scale and simply gave it no weight.  To be clear, "[c]onclusive proof of mitigating circumstances was not found" and "no evidence of mitigating circumstances was found supported by the evidence" are clear statements of exclusion—not devaluation.[19]  Yes, a sentencer may consider mitigating evidence and decide that none of that evidence is worthy of weight.  But the distinction between deciding mitigating evidence deserves no weight and deciding that there is *no* mitigating evidence is one with a constitutional difference.  In the end, the government's attempt to shove the genie back into the constitutional bottle fails especially because it requires re-writing the sentencing judge's own explanation of the sentence.

Still, we pause to entertain the government's position, in response to which we ask: *Why* did the trial court give Allen's evidence of childhood abuse, rumination disorder, and anti-social personality disorder no weight?  The answer to this question reveals that, under the government's theory, the sentencing judge's determination does not comport with the Eighth Amendment principle prohibiting barriers that preclude a sentencer from giving meaningful consideration and effect to all relevant mitigating evidence.

The first possible explanation for the trial court's no-weight determination is that it mistakenly overlooked uncontested mitigating evidence, focusing exclusively—and erroneously—on the contested schizophrenia diagnosis.  Recall that the sentencing judge explained in full:  "Conclusive proof of mitigating circumstances was not found. *Numerous psychiatrists and psychologists testified to conflicting diagnoses of the*

---

[19] This is especially so when paired with the sentencing judge's sworn testimony that "Mr. Allen was NOT conclusively diagnosed to be mentally ill."  J.A. 2010.

53

*defendant's mental health.*"  J.A. 1943 (emphasis added).  This explanation as to why Allen's mitigating evidence was given no weight can be interpreted in only one way:  The sentencing judge gathered Allen's evidence of childhood abuse, rumination disorder, and anti-social personality disorder; placed it on the analytical scale; and proceeded to give all of this evidence zero weight, and did so *because* the experts could not agree as to Allen's mental health diagnoses.  But we know that this factual conclusion is erroneous because, as discussed at length above, no one contested Allen's rumination disorder.  So, to the extent that the state court viewed the sentencing judge's consideration through the "no weight" lens and determined that such consideration of Allen's mitigating evidence was "proper," this conclusion is defective because it flowed from the unreasonable factual determination that the sentencing judge "considered the mitigation evidence as presented."

A second possible explanation for why the sentencing court gave Allen's mitigating evidence no weight is that it applied the wrong legal standard—inquiring whether Allen was competent to be executed, rather than whether a death sentence would be a reasoned moral response to the defendant's background, character, and crime.  Operating under this wrong standard, the sentencing judge may have assigned no weight to Allen's mitigating evidence because he believed that schizophrenia amounts to insanity or incompetency and, without schizophrenia, Allen's mental illness did not render him insane or competent such that the Eighth Amendment would bar his execution.  That would be consistent with the judge's oral sentencing, described above, at which he reviewed Supreme Court decisions categorically prohibiting the execution of the mentally incompetent or insane and "look[ed] . . . as a guide" to South Carolina's standard for whether a defendant is competent to be

54

executed. J.A. 1610. It also is precisely what the sentencing judge suggested he required

in the Post-Sentencing Affidavit that the PCR court failed to consider: "I did say . . . I

thought the Defense team would have to trust Dr. Crawford to convince me that Mr. Allen

was so mentally ill throughout the time of his crimes and was so mentally ill at the time of

trial, that imposition of the death penalty would violate the Eighth Amendment's ban on

cruel and unusual punishment." J.A. 2009.[20]

---

[20] During the penalty stage, the sentencing judge appeared to remain interested in whether Allen was insane. Take for example the following exchange during Dr. deBeck's direct examination:

> Q: You were also asked . . . by [] Court Order to assess Mr. Allen's state of mind at the time o[f] August [] 12th . . .?
>
> A: Yes. . . .
>
> Q: And did you come to some conclusions regarding specifically his state of mind around the time of August the 12th of 2002?
>
> Q: Yes.
>
> [Defense Counsel]: Your Honor, for the record, we do object to the relevance of this in this proceeding.
>
> [The Court]: What's the question?
>
> [Solicitor]: She was ordered to assess his state of mind [for the North Carolina trial], whether or not he was experiencing some major mood or psychotic disorder at the time of around August the 12th, 2002, at the time of the crimes. I think that would be critical.
>
> [The Court]: What's the objection?
>
> [Defense Counsel]: The objection is based on the fact that she was ordered to do an insanity evaluation.

(Continued)

Of course, *Lockett* and its progeny are reduced to a hollow promise if a sentencer—*before* hearing aggravating or mitigating evidence—decides that a defendant must surmount the guilt-phase insanity or incompetency hurdle in the context of the sentencing-phase determination of who shall live and who shall die. If this is the case, no matter the aggravators and their weight and no matter the mitigators and their weight, the defendant dies if he cannot prove he is insane or incompetent. Mitigators that fall short of proving insanity or incompetency stand no chance of sparing the defendant's life and any aggravators would not matter: The defendant must die essentially as a categorical matter. In applying a predetermined standard, particularly one unmoored from a defendant's mitigating evidence, the sentencer sidelines the only vehicle for arriving at a "reasoned moral *response*" to a defendant's specific character and crime. This would be unconstitutional.

Moreover, the sentencing judge also appeared to place an unconstitutional nexus requirement on the mitigating evidence. The judge stated in his affidavit that he was

> Mr. Allen pleaded guilty in North Carolina, pleaded guilty in South Carolina, and insanity—
>
> [The Court]: He didn't plead guilty. He didn't plead guilty. She made her evaluation before he pled guilty.
>
> [Defense Counsel]: Yes, Your Honor. Yes, she did. But this is no longer a relevant issue, and I believe it's getting somewhat confused.
>
> [The Court]: Well, I'm not confused it. . . . I'll overrule the objection. Go ahead.

J.A. 1299–1300.

56

looking for evidence that Allen "was so mentally ill *throughout the time of his crimes* and was so mentally ill *at the time of trial*," that the death penalty would be unconstitutional. J.A. 2009.  The judge's focus on Allen's mental state at these two discrete points in time impermissibly narrowed his focus to mitigating evidence that had some nexus to Allen's crimes, and screened out, for example, evidence of Allen's history of mental health problems and commitments that preceded either his crimes or his trial.  *Cf. Tennard*, 542 U.S. 274 (barring sentencing courts from imposing any requirement that mitigating evidence must have a nexus to the crime).

Whatever the reason for assigning the mitigating evidence no weight—mistaken oversight of evidence, application of an unjustifiably stringent legal standard, or both—it is clear that the Eighth Amendment does not tolerate a capital sentencing scheme where the sentencer ignores or overlooks the existence of a mitigating factor and, as a result, assigns no weight to that mitigating factor or other such factors.  As the Supreme Court explained in *Eddings*, "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence.  But [the sentencer] may not give it no weight by excluding such evidence from [its] consideration."  455 U.S. at 114–15.  Improperly screening out mitigating evidence that does not rise to an arbitrary level of severity, or does not bear a direct nexus to the offense, similarly violates the Eighth Amendment by excluding potentially relevant evidence, contrary to the constitutional requirement that all must be considered.  *See Tennard*, 542 U.S. at 287 ("[T]he question is simply whether the evidence is of such a character that it 'might serve "as a basis for a sentence less than death."'").

57

As the United States Supreme Court has further explained, the source or form of the barrier to giving meaningful consideration and effect to mitigating evidence is immaterial:

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling. . . . *Whatever the cause, . . . the conclusion would necessarily be the same*: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand this case for resentencing."

*Mills*, 486 U.S. at 375 (emphasis added) (citations omitted); *see also Abdul-Kabir*, 550 U.S. at 259 n.21 (recognizing that prosecutorial argument that prohibits a jury from considering relevant mitigating evidence violates the Eighth Amendment); *McKoy*, 494 U.S. at 440 ("[W]e held that it would be the 'height of arbitrariness to allow or require the imposition of the death penalty' where 1 juror was able to prevent the other 11 from *giving effect* to mitigating evidence." (emphasis added) (quoting *Mills*, 486 U.S. at 374)).

In other words, any barrier to a capital sentencer giving meaningful consideration and effect to all relevant mitigating evidence renders the sentencing scheme constitutionally infirm, "[w]hatever the cause." *Mills*, 486 U.S. at 375. The same must be true when a sentencer imposes his or her own barrier by ignoring, overlooking, or screening out mitigating evidence. *See Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or *mistake*." (emphasis added) (quoting *Eddings*, 455 U.S. at 118 (O'Connor, J., concurring))). Here, by ignoring,

58

overlooking, or improperly screening out undisputed mental health evidence, the sentencing judge erected a barrier to giving the requisite meaningful consideration and effect to all of Allen's mitigating evidence.

It is no answer that a sentencing judge "considers" mitigating evidence once he or she permits such evidence to be placed on the record and may then assign some or no weight to such evidence. The Supreme Court's unwavering insistence on giving *meaningful* consideration and effect to mitigating evidence shows that there are situations in which the mere admission of mitigating evidence may not, by itself, guard against the arbitrary imposition of the death penalty.[21] This is such a case. A sentencer can assign little to no weight to such evidence if the sentencer finds it wanting; but a sentencer may not give it no weight by ignoring or overlooking it (thereby giving it less than full effect, and effectively swiping it off the analytical scale). Because assigning no weight to mitigating evidence based on such barriers violates the principles established in *Lockett*, *Eddings*, and its progeny, Allen's death sentence cannot stand. *McKoy*, 494 U.S. at 468 ("Any barrier to such consideration [of mitigating evidence] must fall.").

---

[21] *See Penry*, 482 U.S. at 319 ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that in imposing sentence. Only then we can be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." (quoting *Woodson*, 428 U.S. at 304–05)).

V.

Even though we conclude the state court's adjudication was an unreasonable determination of the facts and contrary to clearly established federal law, "our inquiry is not over." *Barnes v. Joyner*, 751 F.3d 229, 239 (4th Cir. 2014). On collateral review, we cannot grant habeas relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. "[I]f the federal court is 'in grave doubt' about whether the trial error had a 'substantial and injurious effect or influence' on the verdict and therefore finds itself 'in virtual equipoise' about the issue, the error is not harmless." *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (quoting *O'Neal*, 513 U.S. at 435). We must make this determination "based on [our] review of the record . . . as a whole." *Id.*

We are in grave doubt that the errors in this case did not have a substantial and injurious effect. First, the evidence presented demonstrates that Allen is conclusively diagnosed with rumination—an Axis I mental illness. The sentencing decision likely would be different if the sentencing judge had not excluded, ignored, or overlooked this disorder. Indeed, the sentencing judge found no conclusive proof of mitigating circumstances specifically because the experts disagreed as to Allen's mental illness. Had his rumination been placed in the analytical mix, the sentencing judge likely would have found conclusive proof of a mitigating circumstance.

Moreover, as the sentencing judge swore in the Post-Sentencing Affidavit: "I believed Mr. Allen was seriously mentally ill and had that been proven during the penalty phase, there likely would have been no PCR issues because *he would have received the life*

60

*sentences* the [d]efense team sought." J.A. 2010 (emphasis added). We cannot be certain what "seriously mentally ill" means to the sentencing judge. A reasonable guess (based on our analysis thus far) is that schizophrenia would fall within that bucket and because rumination is also an Axis I disorder, if the sentencing judge had considered it, rumination may have fit the "seriously mentally ill" bill too. Notably, despite a lengthy discussion about the depravity of Allen's crimes, the sentencing judge still made this unequivocal proclamation that Allen "would have received [a] life sentence[]" had trial counsel proven "serious[] mental[] illness." *Id.* So, the Post-Sentencing Affidavit itself indicates that the aggravators would not have throttled the imposition of a life sentence if Allen proved "serious[] mental[] illness."

Beyond overlooking the fact that Allen does, in fact, have a serious mental illness uncontested by any psychiatrist testimony, the sentencing judge also failed to consider another major component of Allen's mitigation case—his history of childhood abuse. As the Supreme Court has acknowledged, "[e]vidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." *Eddings*, 455 U.S. at 115. Proper consideration of Allen's thorough case of an abusive and unstable childhood may very well have also changed the sentencing decision.

The record in this case leaves us with grave doubt that excluding, ignoring, or overlooking Allen's serious mental illness and history of childhood abuse had no substantial and injurious effect or influence on the outcome of the sentencing proceeding. Therefore, Allen is entitled to relief.

61

The doubt surrounding the voluntariness of Allen's guilty plea makes us particularly unwilling to conclude that the sentencing judge's error here may have been harmless. The sentencing judge denied that he promised Allen a life sentence, but even by his own account, he did strongly suggest he was inclined toward leniency if Allen's lawyers were able to convince him of Allen's serious mental illness. J.A. 2009. And the PCR court, in finding no due process violation, cited statements from the lawyers that they believed, based on the representations of the judge, that if they convinced him Allen was seriously mentally ill, the judge would impose a life sentence. J.A. 2566. Allen then chose to waive his right to a jury and put the sentencing decision in the judge's hands. After making such consequential representations to the lawyers, it was particularly important for the judge to give fair and full consideration to the mitigating evidence that Allen proffered. In such circumstances, we are especially reluctant to conclude that the failure to properly consider mitigating evidence was harmless when the mitigation case factored so heavily into the decision to enter a guilty plea at all.

## VI.

Death is final. Well-storied Eighth Amendment jurisprudence recognizes that a capital defendant's due process rights require far greater protection during the penalty phase because this last phase determines whether he lives or dies. Equal justice under the law demands that a death-eligible defendant's individual background, characteristics, and culpability are given meaningful consideration and effect before imposing a sentence of death.

A sentencer may very well impose the death sentence because she believes a defendant should pay for his crimes with his life. But a sentencer can only do so after considering all of the aggravators and all of the mitigators, and weighing them in a way that conforms with Eighth Amendment jurisprudence. That did not happen here. And we know this because, in this rare instance, the sentencer's words and sworn testimony are in the record.

The sentencer in this case excluded, ignored, or overlooked Allen's clear and undisputed mitigating evidence, thereby erecting a barrier to giving this evidence meaningful consideration and effect and eviscerating the well-established requirements of due process in deciding who shall live and who shall die. Because this violates the Eighth Amendment's guarantee against the arbitrary imposition of the death penalty, we reverse the judgment of the district court and remand with instructions that the district court issue the writ of habeas corpus unless the State of South Carolina grants Allen a new sentencing hearing within a reasonable time.

*REVERSED AND REMANDED*

RUSHING, Circuit Judge, dissenting:

The majority opinion paints a picture of a South Carolina judge who presided over a ten-day capital sentencing trial and then, when imposing the sentence on the final day, either forgot or deliberately ignored all of the defendant's evidence except his contested schizophrenia diagnosis. Unsurprisingly, that portrayal is not accurate. And it certainly is not the only reasonable way to read the record, which is "the only question that matters" for our purpose as a federal court reviewing a state court's decision on post-conviction review. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (internal quotation marks omitted).

I respectfully dissent.

## I.

In our federal system, "the States possess primary authority for defining and enforcing the criminal law and for adjudicating constitutional challenges to state convictions." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1730–1731 (2022) (internal quotation marks, brackets, and citations omitted). Federal habeas review—by which a federal court may order the release or retrial of a state prisoner—is accordingly highly constrained. We may not "disturb[] state-court judgments on federal habeas review absent an error that lies 'beyond any possibility for fairminded disagreement.'" *Mays v. Hines*, 141 S. Ct. 1145, 1146 (2021) (per curiam) (quoting *Shinn v. Kayer*, 141 S. Ct. 517, 520 (2020) (per curiam)). This means federal habeas review is not "'a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts.'" *Walters v. Martin*, 18 F.4th 434, 441 (4th Cir. 2021) (quoting *Williams v. Taylor*, 529 U.S. 362, 383 (2000)), *cert. denied*, 142 S. Ct. 1455 (2022).

64

Specifically, Congress has instructed that a federal court "shall not" grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the state adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). These standards are "difficult to meet." *Richter*, 562 U.S. at 102.

As relevant here, a decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). And a decision is based on an unreasonable determination of the facts only where "the factual determination is sufficiently against the weight of the evidence that it is objectively unreasonable, which means it must be more than merely incorrect or erroneous." *Burr v. Jackson*, 19 F.4th 395, 403 (4th Cir. 2021) (internal quotation marks and brackets omitted); *see Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." (internal quotation marks omitted)) The state court's factual determinations are "presumed to be correct," and the petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In sum, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (internal quotation marks omitted).

65

II.

After Quincy Allen received the death penalty and lost his direct appeal in state court, he sought relief in South Carolina's post-conviction relief (PCR) court. That court considered and rejected Allen's arguments against his death sentence. He tried again in federal court, arguing that the sentencing judge failed to consider all the evidence he offered in mitigation and that the judge applied the wrong standard for analyzing his mental-health evidence.[1] The district court denied relief, concluding that Allen failed to show that the PCR court's ruling rejecting these arguments was contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The district court's conclusion was correct. Because fairminded jurists could agree with the PCR court's decision, the majority errs in overriding the state court to grant relief.

A.

Allen contends that the PCR court made an unreasonable determination of the facts or application of law when it found that the sentencing judge considered all the mitigating

---

[1] This opinion focuses on the ground on which the majority grants relief. But the other four claims included in the certificate of appealability also fail under AEDPA's deferential standard. The majority does not address Allen's other two sentencing-related claims. *See supra*, at 35–36 n.15. As for the remaining two assignments of error, the majority rejects them, correctly denying Allen relief from his guilty plea. *See supra*, at 36 n.16. The PCR court determined that, in pleading guilty, Allen relied on counsel's advice that he had a better chance for a life sentence with the judge than with a jury and counsel's strategic decision in this regard was not constitutionally ineffective assistance. These decisions were not "contrary to" or an "unreasonable application of" clearly established federal law, nor were they "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

66

evidence Allen presented.  Allen argues that, to the contrary, the sentencing judge confined his consideration of mitigating evidence to Allen's "mental state during the crimes and at trial" and "did not discuss any aspect of [his] non-mental-health mitigating evidence in any depth."  Opening Br. at 52–53.

The Eighth Amendment to the United States Constitution requires that a sentencer "be able to consider and give effect to" a capital defendant's relevant mitigation evidence. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal quotation marks omitted).  Relevant evidence offered in mitigation cannot be excluded from the sentencer's consideration, whether by statute, evidentiary ruling, or the sentencing court's refusal to consider evidence as a matter of law.  *Mills v. Maryland*, 486 U.S. 367, 375 (1988); *see Eddings v. Oklahoma*, 455 U.S. 104, 113–114 (1982).  Likewise, the sentencer must be "permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007).  In other words, the State may not prevent a capital sentencer from considering relevant mitigation evidence and according that evidence significance in its sentencing decision.  But the Constitution does not *require* a sentencer to conclude that any evidence mitigates a defendant's culpability or otherwise warrants a sentence of life instead of death.  Rather, the sentencer retains discretion, within the bounds of state law, to "determine the weight to be given relevant mitigating evidence." *Eddings*, 455 U.S. at 115.

The sentencing judge here did not exclude or refuse to consider Allen's mitigation evidence.  No statute or rule prevented the judge from considering the evidence.  Indeed, South Carolina law required the sentencing judge to consider both statutory and

67

nonstatutory mitigating circumstances. *See* S.C. Code Ann. § 16-3-20(C) (2005). Nothing

in the record suggests that the sentencing judge believed he could not consider, or otherwise

would not consider, any of the mitigation evidence Allen offered.

To the contrary, the sentencing judge expressly stated that he considered all of

Allen's evidence. For example, at the sentencing hearing, the judge stated:

> In considering the outcome of this sentencing hearing I have tried to
> understand the unique forces and events which have put Mr. Allen in the
> situation in which he finds himself today. I have considered his upbringing
> so masterfully chronicled by Debra Grey. I've considered his list of mental
> illness as described by Dr. Pam Crawford.
>
> I've considered the facts of the various murders that Mr. Allen does not deny.
> I've considered the impact to [the victims]. I've also considered the effect
> of this trial on Quincy Allen's two younger brothers who have sat through
> the majority of this trial. And I have considered the passionate arguments of
> counsel on both sides of this case.
>
> . . .
>
> I have listened to and read the accounts of all of the psychiatrists and
> psychologists in this case: Doctors Hilkey, Gupta, Lavin, DeBeck, Hattem,
> Crawford, Mirza, Tezza, Corvin and Schwartz-Watts.

J.A. 1600, 1603; *see also* J.A. 1626 (judge pronouncing sentence "[a]fter carefully

considering all relevant facts and circumstances, including the existence of statutory

aggravating circumstances as well as the claim of mitigating circumstances"). A

reasonable jurist could credit the judge's statements when announcing Allen's sentence.

As the Supreme Court concluded in a similar circumstance: "We must assume that the trial

judge considered all [the defendant's mitigation] evidence before passing sentence. For

one thing, he said he did." *Parker v. Dugger*, 498 U.S. 308, 314–315 (1991), *holding

modified by Brown v. Sanders*, 546 U.S. 212 (2006).

68

The sentencing judge then went on to discuss in detail some of Allen's evidence—particularly his evidence of mental illness—and describe how he assessed it. Mental illness was the most disputed mitigation argument and the one the defense pressed most vigorously, so the judge's lengthy discussion of that evidence is unsurprising. *See, e.g.*, J.A. 1561–1562 (defense counsel asserting in closing argument that "[t]here is only one real disputed issue here," and "[t]he one disputed issue is whether or not [Allen] was mentally ill in the summer of 2002, whether or not he is mentally ill now"). Because the State did not dispute Allen's age or traumatic childhood, not much remained to be said about those circumstances other than the fact that the judge considered them.

The post-sentence report further demonstrates that the sentencing judge considered the evidence offered in mitigation but found it unpersuasive. On that form, the judge indicated that several statutory mitigating circumstances, including the presence of a mental disturbance, were "in evidence" but none were "found supported by the evidence." J.A. 1942; *see* S.C. Code Ann. § 16-3-20(C)(b) (2005). The judge explained, writing: "Conclusive proof of mitigating circumstances was not found. Numerous psychiatrists and psychologists testified to conflicting diagnoses of the Defendant's mental health." J.A. 1943. Thus, the sentencing judge acknowledged that Allen presented evidence in support of mitigation, but the judge ultimately did not find the evidence to be mitigating, a decision that South Carolina law entrusted to him alone. *See State v. Bell*, 360 S.E.2d 706, 713 (S.C. 1987).

The PCR court rightly concluded that the sentencing judge "consider[ed] the mitigation evidence as presented." J.A. 2582. As the district court put it, "the Constitution

69

does not require a capital sentencer to find the existence of a mitigating factor, only to consider all of the evidence offered in mitigation," and Allen "does not rebut the record's clear indication that [the sentencing judge] did, in fact, consider it." J.A. 37. At a minimum, the PCR court's determination is not objectively unreasonable, as required for federal habeas relief, because it is reasonable to read the sentencing judge's statements as considering and rejecting Allen's mitigation claims. Because "fairminded jurists could disagree on the correctness of the PCR court's decision," the law "precludes federal habeas relief." *Richter*, 562 U.S. at 101 (internal quotation marks omitted).

The majority nevertheless grants Allen federal habeas relief based on its own reimagination of the law and the record. First, the majority incorrectly asserts that the sentencing judge was required to "give effect to *all* of Allen's mitigating evidence." *Supra*, at 43. As explained above, that is not true. The sentencing judge must be "*permitted* to consider fully such mitigating evidence" and "*permitted* to give that evidence meaningful, mitigating effect in imposing the ultimate sentence," *Abdul-Kabir*, 550 U.S. at 260 (emphases added) (internal quotation marks omitted), but he is not required by clearly established federal law to give particular weight to any evidence offered in mitigation, *see Eddings*, 455 U.S. at 114–115. The majority's conclusion that the sentencing judge "failed to give *meaningful* consideration and effect to all of Allen's mitigating evidence" is not a critique founded in law; it is merely a statement that the majority would have evaluated Allen's evidence differently. *Supra*, at 43 (internal quotation marks omitted).

Second, and relatedly, much of the majority's supposed proof that the sentencing judge did not consider certain evidence Allen presented instead demonstrates that the judge

70

did not find that evidence mitigating in Allen's case. The majority conflates two uses of the term "mitigating." In one sense, all evidence a capital defendant introduces at the penalty phase of trial is "mitigating evidence" because it "might serve as a basis for a sentence less than death." *Tennard*, 542 U.S. at 285 (internal quotation marks omitted). But not all evidence offered for its potential mitigation value ultimately will be found by the factfinder to warrant a lesser sentence—i.e., to "mitigate" the defendant's culpability or his punishment. And that judgment, of course, was for the sentencing judge to make.

For example, the majority reads the statements in the post-sentence report that mitigating circumstances were not "found supported by the evidence" and "[c]onclusive proof of mitigating circumstances was not found," J.A. 1942–1943, to mean that the sentencing judge refused to consider Allen's evidence about "rumination disorder, anti-social personality disorder, and childhood abuse" because those circumstances are "potentially mitigating as a matter of law," *supra*, at 46. But a reasonable jurist could understand that the sentencing judge considered this potentially mitigating evidence—as he said he did, *see* J.A. 1600—and was not persuaded that it in fact mitigated Allen's culpability or punishment.

Similarly, the majority takes issue with the sentencing judge's statement, in announcing his sentence, that he considered "the existence of statutory aggravating circumstances as well as the claim of mitigating circumstances." J.A. 1626. According to the majority, mitigating circumstances "existed just as much as the aggravators did" because Allen presented undisputed evidence of childhood abuse, rumination, and anti-social personality disorder. *Supra*, at 48. But again, the sentencing judge was entitled to

71

consider that evidence and find it not mitigating. More to the point for the purpose of this federal habeas appeal, nothing in this statement suggests the judge ignored or overlooked the evidence supporting Allen's "claim of mitigating circumstances." J.A. 1626.

The remainder of the majority's supposed proof that the sentencing judge did not consider all of Allen's mitigation evidence focuses on his rumination disorder, an issue not even Allen advances. Nowhere in his briefs does Allen argue that his rumination disorder was a mental illness that the sentencing judge excluded or ignored; indeed, he mentions the word "rumination" only twice—on a single page in the factual background of his opening brief. *See* Opening Br. at 9. That is consistent with Allen's treatment of the disorder at trial.

According to the majority, the sentencing judge must have excluded rumination from his consideration because he stated in a post-sentencing affidavit that Allen was not "'conclusively diagnosed to be mentally ill.'" *Supra*, at 44 (quoting J.A. 2010). Although rumination qualifies as a "psychiatric illness," J.A. 625, Allen's witnesses repeatedly referred to rumination as an "eating disorder," *see, e.g.*, J.A. 334, 336, 340, 540–543, 587, 590, 759, 760, 1323; *see also* J.A. 1922–1925, 1927–1930, 2169. By contrast, when Allen's counsel argued for mercy based on his mental illness, they focused on schizophrenia—which they claimed made him "very dangerous," "delusional," "oblivious," "[n]onresponsive," and "bizarre," J.A. 1568, 1573–74, 1581—not rumination. *See, e.g.*, J.A. 1562–1586 (defense closing argument focusing on the "one disputed issue" of "whether or not [Allen] was mentally ill in the summer of 2002, whether or not he is mentally ill now"). As defense counsel made crystal clear: "Time has proven what is

72

wrong with Quincy Allen. . . .  [I]t is our position that he is schizophrenic, that he was schizophrenic at the time, and he is schizophrenic now." J.A. 1585.  Given the context, the sentencing judge's statement about mental illness in his post-sentencing affidavit naturally refers to the schizophrenia that Allen argued controlled his actions.  It blinks reality to read the judge's comment as asserting that Allen never suffered from rumination.[2]

The majority also infers that the sentencing judge must have refused to consider rumination from the fact that he wrote on the post-sentence report that Dr. Crawford diagnosed Allen with schizophrenia, omitting mention of a rumination diagnosis.  *See supra*, at 46–47.  But the judge's report is in line with Dr. Crawford's testimony that her diagnosis of Allen was schizophrenia.  *See* J.A. 757 ("My diagnosis of him is schizophrenia.").  Dr. Crawford discussed the criteria for diagnosing schizophrenia, the symptoms, and how Allen's statements during one of his crimes aligned with schizophrenic delusions.  Dr. Crawford also spent a significant amount of time discussing whether Allen was malingering the schizophrenia—that is, faking the symptoms.  In hundreds of pages of testimony, Dr. Crawford mentioned rumination only in passing.  Dr. Crawford's main dialog about rumination emphasized that Dr. Harding, Allen's psychiatrist as a child, had

---

[2] Regarding the post-sentencing affidavit, the majority also asserts that the PCR court's "decision to ignore" it "when deciding Allen's two-part mitigation evidence claim" "fatally undermined the fact-finding process" and "no rational fact-finder" would have done so.  *Supra*, at 51 (internal quotation marks omitted).  But Allen presented his mitigating evidence argument to the PCR court solely in the context of a claim that counsel rendered ineffective assistance by failing to object during the sentencing hearing.  *See* J.A. 2542–2543, 2581–2582.  The post-sentencing affidavit was written months after the sentencing hearing and thus could not possibly be relevant to the PCR court's assessment of Allen's claim.

made the rumination diagnosis and she merely adopted his understanding. *See* J.A. 759 ("He also has a eating disorder not otherwise specified, what Dr. Harding referred to as the atypical eating disorder, the rumination."). In fact, Dr. Crawford emphasized that she "certainly was not an expert in rumination." J.A. 760.

At bottom, the majority claims the sentencing judge did not give sufficient consideration and weight to some of the evidence Allen offered in mitigation. Even accepting that premise, it cannot support federal habeas relief under the standards imposed by Congress. *See* 28 U.S.C. § 2254(d). Having identified neither an objectively unreasonable factual determination by the PCR court nor a "materially indistinguishable" Supreme Court decision that the PCR court contradicted, the majority errs in granting relief. *Bell*, 535 U.S. at 694; *see also Burr*, 19 F.4th at 403.

B.

Allen also contends that the sentencing judge analyzed his mental health evidence under the wrong legal standard. The PCR court was not persuaded that the sentencing judge "confused the competency to be executed standard with the standard for finding mental illness," concluding that the record was "more fairly read to reflect a global assessment of the facts and circumstances before the sentencing judge, which he considered, weighed and narrowed, until arriving at his sentencing conclusion." J.A. 2582. After comprehensively reviewing the sentencing judge's analysis, the district court agreed, explaining that the judge found Allen competent to be executed "but did not end his analysis there." J.A. 35. The majority does not decide this question.

74

The PCR court's conclusion was reasonable. Tracking the defense's argument about mental illness, the sentencing judge first discussed whether Allen was mentally ill around the time of the murders, concluding that Allen did not have "a major mental illness at the time of the crimes" and "if indeed he had schizophrenia, it was not evident and the disease did not control his mind to such a degree as to exonerate or lessen the culpability of his actions." J.A. 1601, 1603.[3] Then the judge considered whether Allen was mentally ill at the time of trial. It was in the context of this second inquiry that the sentencing judge discussed the standard for competency to be executed, among other considerations.

Allen argues that the sentencing judge's post-sentencing affidavit shows that he applied too strict a standard to Allen's evidence of mental illness. In that affidavit, the judge wrote that he had told the defense lawyers before trial, in not so many words, that they "would have to trust Dr. Crawford to convince [him] that Mr. Allen was so mentally ill throughout the time of his crimes and was so mentally ill at the time of trial, that imposition of the death penalty would violate the Eighth Amendment's ban on cruel and unusual punishment." J.A. 2009. Considered in isolation, the implication of the affidavit is troubling. But we may not consider it isolated from the judge's explanation for his

---

[3] Two statutory mitigating factors under South Carolina law concern the effect of mental illness on the defendant at the time of the crime. *See* S.C. Code Ann. § 16-3-20(C)(b)(2), (6) (2005). Throughout closing arguments, defense counsel portrayed Allen as so impaired, even controlled, by mental illness at the time of the crimes that he was not able to act rationally. *See, e.g.*, J.A. 1569 ("[H]is aha [moment] was I'm a serial killer. This is my job and this is what I am supposed to do. I have no control over it."); J.A. 1572–1573 ("[H]e is delusional and has set out to complete his mission of being a serial killer because he believes that that's what he has to do, that he is compelled to do that, that that is his job.").

75

sentencing decision on the record at the sentencing hearing seven months earlier. Assessed as a whole, the record is at worst ambiguous, meaning reasonable jurists could disagree and we may not upset the PCR court's judgment. *See Mays*, 141 S. Ct. at 1146.

III.

The state PCR court considered and rejected Allen's arguments about the sentencing judge's treatment of his mitigation evidence in this South Carolina capital case. Because that determination "was not so obviously wrong as to be 'beyond any possibility for fairminded disagreement,'" we are bound by federal law to defer to the state court and deny habeas relief. *Kayer*, 141 S. Ct. at 526 (quoting *Richter*, 562 U.S. at 103); *see* 28 U.S.C. § 2254(d). The majority, however, "set[s] aside reasonable state-court determinations of fact in favor of its own debatable interpretation of the record." *Rice v. Collins*, 546 U.S. 333, 335 (2006). I cannot go along with the majority's retelling or its disregard of the "settled rules that limit [our] role and authority." *Id.*